519 P.2d 860

**ARIZONA TITLE INSURANCE & TRUST COMPANY, an Arizona corporation, Appellant,**

v.

**Mary W. SMITH, as Executrix of the Estate of Norman H. Smith, Deceased, Appellee.**

No. 2 CA–CIV 1516.

Court of Appeals of Arizona, Division 2.

March 12, 1974.

Rehearing Denied April 9, 1974.

Review Denied May 7, 1974.

**372**

Stuart Herzog, Tucson, for appellant.

Murphy, Vinson & Hazlett, P. C., by Carl E. Hazlett, John U. Vinson and Thomas M. Murphy, Tucson, for appellee.

## OPINION

HATHAWAY, Chief Judge.

Defendant Arizona Title Insurance and Trust Company (the company) appeals from a judgment rendered in favor of Mary W. Smith, widow and executrix of the estate of policy holder Norman H. Smith.

When Mr. Smith moved to Tucson from Colorado in 1961 for health purposes, he owned several parcels of real estate in Colorado. Between 1962 and 1966, he searched for suitable investment property in Tucson. In early 1966, two real estate brokers, Mr. Alan R. Friedman and Mr. Stewart Bailey informed him that the Villa Venice apartment complex in Tucson had been listed with their firm. The owners of the Villa Venice complex agreed to exchange it for an office building owned by Mr. Smith in Colorado together with cash and a promissory note. After examining computations of the "cash flow" related to the Villa Venice complex with Mr. Friedman and Mr. Bailey, Mr. Smith signed an agreement to exchange the properties on March 3, 1966. On May 19, 1966 both parties conveyed their respective properties and on May 27, a title insurance policy was issued to Mr. Smith by defendant insuring Mr. Smith against "loss or damage" resulting from "(a)ny defect in or lien or encumbrance on the title" to Villa Venice except those specifically listed in the policy.

In 1964 the City of Tucson had levied a special assessment on the Villa Venice complex which constituted a lien on the property. As of the May 1966 closing, approximately $13,000 remained to be paid on this assessment. The payments amounted to roughly $2,500 a year and were paid by the owners of Villa Venice as part of their monthly mortgage payments to Tucson Federal Savings, the holder of the mortgage on the property. The payments were deposited into an impound account along with the payments for real property taxes and insurance. The mortgagee would then pay the taxes, insurance premiums, assessment and interest on the assessment out of this impound account when they became due.

The title insurance policy failed to list the assessment as excluded from coverage under the policy. The employee of the company who conducted the title search admitted that the assessment was properly recorded and that the failure to list it was his error.

In August 1966, plaintiff testified that Mr. Smith became concerned over the amount of monthly payments on the prop-

erty. She stated that he tried to contact his attorney but he was out of town. Mr. Smith became ill and entered a hospital. He died in November, 1966.

At trial, the company sought to prove that the assessment was not covered by the policy by reason of the following exclusion which was incorporated into the policy:

"This policy does not insure against loss or damage by reason of the following:

   \*    \*    \*    \*    \*    \*

(d) Defects, liens, encumbrances, adverse claims against the title as insured or other matters

(1) created, suffered, assumed or agreed to by the Insured claiming loss or damage; or (2) known to the Insured Claimant either at the date of this policy or at the date such Insured Claimant acquired an estate or interest insured by this policy and not shown by the public records . . . . "

The company argues on appeal that the evidence established the applicability of this exclusion as a matter of law and that the jury verdict awarding plaintiff the amount of the assessment was therefore not supported by the evidence.

Plaintiff's prima facie case—the existence of the policy, the existence of a title defect not specifically excluded, and notice to the insurer—was virtually conceded by the company. Pacific Indemnity Company v. Kohlhase, 9 Ariz.App. 595, 455 P.2d 277 (1969). The burden of showing the exclusion therefore fell upon the company. Vanguard Insurance Company v. Cantrell, 18 Ariz.App. 486, 503 P.2d 962 (1972); United American Life Insurance Company v. Beadel, 13 Ariz.App. 196, 475 P.2d 288 (1970); Pacific Indemnity Company v. Kohlhase, supra.

At the outset, we note the well-accepted rule of resolving any ambiguity in insurance policies against the insurer and in favor of coverage. Caballero v. Farmers Ins. Group, 10 Ariz.App. 61, 455 P.2d 1011

(1969); Brenner v. Aetna Ins. Co., 8 Ariz.App. 272, 445 P.2d 474 (1968).

■ Our first consideration is the exclusion of coverage for any title defect "known to the Insured Claimant . . . and not shown by the public records . . . . " This clause clearly would not exclude coverage unless (1) the insured had actual knowledge of the assessment and (2) the assessment was not recorded. Since the company introduced no evidence tending to show that the assessment was not recorded, we find that it failed to meet its burden of proof as to this exclusion.

■ The company contends that Mr. Smith in signing the exchange agreement, as a matter of law, rendered the assessment one which was "created, suffered, assumed or agreed to by the Insured . . . . " and therefore not covered by the policy.[1]

The exchange agreement which Mr. Smith had signed 45 days before closing was introduced into evidence. It was a printed form with other pertinent provisions typed in. It stated neither the balance of the assessment due (approximately $13,000) nor the yearly payments on the assessment (approximately $2,500). After a brief description of the Villa Venice, the exchange agreement specified in typewriting that it was to be conveyed subject to the following:

"Twenty (20) existing first realty mortgages totaling approximately $708,000 payable [at] $6,756 including principal, interest at the rate of 6% per annum on the balance remaining from time to time unpaid, taxes, insurance, and assessments to Tucson Federal, Speedway Office."

The printed form portion of the agreement referred to assessments in two other places. One clause provided that all "taxes, insurance premiums, interest on assessments and mortgages or contracts, rentals and water charges, and unused mortgage impoundments on respective properties,

---

1. Cases construing the above-quoted clause can be found in an annotation at 93 A.L.R.2d 527 (1964).

shall be prorated . . . . ." The other provided that each property conveyed shall be subject to "all restrictions of record, utility easements, zoning ordinances, current undue taxes, and non-delinquent assessments including assessments for improvements initiated but which have not yet become liens."

■ Clearly the assessment was not created or suffered by the insured. The word "created" would require some affirmative act on the part of Mr. Smith in bringing about the assessment. The word "suffered" is synonymous with the word "permit" and implies the power to prohibit or prevent the lien which has not been exercised although the insured has full knowledge of what is to be done with the intention that it be done. Hansen v. Western Title Ins. Co., 220 Cal.App.2d 531, 33 Cal.Rptr. 668, 98 A.L.R.2d 520 (1963); First Nat. Bank & Trust Co. v. New York Title Ins. Co., 171 Misc. 854, 12 N.Y.S.2d 703 (1939). Since Mr. Smith clearly did not bring about the assessment or allow it to be brought about, he did not "create" or "suffer" the assessment.

■ The company argues that the assessment was "assumed" when Mr. Smith signed the exchange agreement providing that he would take the property "subject to" "assessments". Under our policy of construing insurance policies in favor of the insured, we must reject this contention. Courts have consistently construed the words "assumed" and "subject to" as conveying totally different meanings in real estate transactions. In Del Rio Land, Inc. v. Haumont, 110 Ariz. 7, 514 P.2d 1003, 1005 (1973), the Arizona Supreme Court recently defined the words "subject to" as meaning "burdened with" in the context of real property sales. The court made it clear that a purchaser taking realty subject to an encumbrance "does not necessarily assume a personal obligation to pay it." (Emphasis added). We therefore cannot hold that Mr. Smith "assumed" the assessment in question merely because he agreed to take the property "subject to" any assessments.

■ We must next consider whether Mr. Smith "agreed to" the assessment in question as a matter of law. When used in a legal setting, "agreed" usually carries the connotation of "contracted". Fish v. Fish, 307 S.W.2d 46, 50 (Mo.App.1957). Mr. Smith was clearly not a party to any contract providing for an assessment on the property. The assessment was imposed unilaterally by the City of Tucson. The company argues, however, that Mr. Smith contractually "agreed to" the assessment in signing the exchange agreement. Assuming that one could "agree to" an assessment within the terms of the exclusion in this manner, our policy of construing ambiguities in favor of the insured leads us to require *actual knowledge* on the part of the insured as to the *full extent and amount of the assessment* before the exclusion would become operative.

Implicit in the jury verdict for plaintiff in this case is a finding that the insured did not have actual knowledge of the assessment before the effective date of the policy. The company relies heavily upon the fact that the exchange contract mentioned the word "assessments" three times —once in typewriting and twice in the printed form. We cannot say as a matter of law that the insured had knowledge of the assessment merely because he signed this agreement when the document contained neither the total amount due on the assessment nor the yearly payment on it, but only the word "assessments". Mr. Benisch, president of the escrow company which handled the escrow, Mr. Bailey, one of the real estate brokers, and Mr. Marshall, who was a vice president of Tucson Federal Savings at the time of the transaction, all testified that persons connected with real estate finance were able to analyze the components of mortgage payments by memorizing the acronym PITIA. The letters stand for principal, interest, taxes, insurance and assessments. All three witnesses stated that the five preceding words were routinely included in real estate agreements whether or not the property

was actually conveyed subject to assessments. Mr. Marshall testified as follows:

"Q. However, Mr. Marshall, just the fact that it was typed on there in and of itself wouldn't make you assume as a fact that there were assessments, would it, because there are times when people just use the same rhetoric time and time again?

A. No it wouldn't make me assume it was a fact."

The irrelevancy of the word "assessments" as it was written in the exchange agreement is borne out by the fact that Mr. Benisch's "trained eye" did not notice any inconsistencies between the agreement and the preliminary title report (which did not specifically exclude the assessment) when he compared the two prior to closing. We cannot overrule the jury and say that Mr. Smith knew of the assessment as a matter of law merely because he signed an agreement which he did not prepare and which made bare references to "assessments" when these references could just as easily have been included in the agreement if in fact there had been no assessment on the property.

In addition to the exchange agreement discussed above, the company, in attempting to show that the insured had knowledge of the assessment, introduced into evidence a printed form prepared by the realtors, Friedman and Bailey. It was part of a "listing" and contained various data relevant to the Villa Venice complex. Among certain expense items it listed "Assess. $2,548.36". It did not state whether this was the full amount of the assessment or merely the yearly payment toward its satisfaction.

The company introduced much circumstantial evidence tending to show that Mr. Smith had seen this "listing" or at least had reviewed the figures on it. Plaintiff testified that Mr. Smith had met with the brokers Friedman and Bailey several times before deciding to enter into the exchange. Although Mr. Friedman testified that he was almost certain that he had given Mr. Smith a copy of the listing before closing, his prior testimony on deposition was introduced wherein he stated that it was "possible" that he gave Mr. Smith a copy of the listing. Also during his testimony at trial, Mr. Friedman felt certain that they had discussed all of the items stated on the listing. Again he was impeached by the following testimony which he had given at a prior deposition:

"Question: During the course of this transaction, prior to Mr. Smith signing . . . the exchange agreement, do you recall any discussions with him about assessments?

Answer: Not specifically, no. I can't say that I can recall . . . . ."

At one point, the company offered the testimony of Mr. William Pessin, one of the sellers of Villa Venice, that he had discussed the assessment with Mr. Smith before closing. He was impeached by the following testimony given at a prior deposition:

"Question: How do you know that Mr. Smith was aware that the expenses were for assessments each year and was approximately $2,500?

Answer: Well, I don't. I wont say that I know he knew it was approximately $2,500 but I know that I can't place the time. After he took possession we hung around the office with him for two or three weeks to acquaint him with the tenants, and that I can recall, and I can't put my finger as to why or when. In fact, he asked us a number of times for advice and what to do about that and I can remember on several occasions the subject of assessments coming up.

Question: Did he take possession before or after the closing?

Answer: No after the closing."

A thorough review of the transcript indicates that no witness gave unimpeached testimony to the effect that he could specifically recall discussing the assessment with Mr. Smith before the effective date of the policy. Although there was an

abundance of circumstantial evidence from which the jury could draw the inference that Mr. Smith had known of the assessment, the jury did not draw this inference. It is not our function on review to hold that a fact has been established by the evidence when reasonable men could differ as to whether it has been established. We hold that reasonable men could differ as to whether the company in this case established by a preponderance of the evidence that Mr. Smith had full knowledge of the extent and amount of the assessment before the effective date of the policy.

■ The company argues that the knowledge of the real estate brokers, Friedman and Bailey, can be imputed to Mr. Smith since they were his agents. The evidence showed that Friedman and Bailey were agents of both parties to the transaction or "dual agents". While the knowledge of an agent acting for both parties can be imputed to either principal[2] under some circumstances such knowledge is constructive—not actual—under the law of agency. We noted above that before the insured can be said to have "agreed to" the assessment, he must have *actual knowledge* of it. The American Law Institute, in Restatement of Agency 2d, § 275, recognized that the knowledge imputed by law from an agent to his principal is irrelevant in situations where actual knowledge is required:

> "Except where the agent is acting adversely to the principal *or where knowledge as distinguished from reason to know is important,* the principal is affected by the knowledge which an agent has a duty to disclose to the principal . . . . " (Emphasis added).

In Flinn Realty Corp. v. Charter Constr. Co., 181 App.Div. 610, 169 N.Y.S. 116 (1918), plaintiff sued for rescission of a contract for the exchange of properties on the ground of mistake. The defendant argued that plaintiff had knowledge of the actual facts because his agent, a broker,

had such knowledge. The court rejected this contention with the following language (169 N.Y.S. at 118):

> "As to the fact of constructive notice by reason of his agency, this fact is without significance, because here is a question of actual intention, and actual intention can only be judged by actual knowledge and not by constructive knowledge."

Among other cases holding that knowledge imputed by the law of agency is irrelevant when actual knowledge is required are Harte v. United Benefit Life Insurance Co., 66 Cal.2d 148, 56 Cal.Rptr. 889, 424 P.2d 329 (1967); In re Fiddyment's Estate, 74 Cal.App.2d 72, 168 P.2d 61 (1946); and Sisk v. McPartland, 515 P.2d 179 (Or. 1973). We are unable to conclude that Mr. Smith "agreed to" the assessment within the terms of the exclusion since the company failed to establish that he had actual knowledge of it.

■ The company contends that it was error for the trial court to allow the jury to award the remaining balance of the assessment ($13,000) as damages. Apparently the company reasons that since Mr. Smith was primarily interested in the cash flow of the property (i. e., the difference between gross rents and the owner's monthly payments) and since the monthly payments to the mortgagee-bank included an amount which was to be paid by the latter for the assessment, Mr. Smith suffered no loss. The policy insured against "loss or damage" caused by title defects. The $13,000 was assessed for certain improvements undertaken by the city which presumably enhanced the value of the property. The total purchase price of the Villa Venice was quoted in the closing statement as $821,693.60. Mr. Smith received a preliminary title report before closing which made no mention of any assessment. It is within the province of the jury to conclude that Mr. Smith would have insisted that the owners of Villa Venice reduce their sales price had he been informed by the

---

2. See Annot. 4 A.L.R.3d 224 (1965) for a collection of cases dealing with imputed notice in dual agency situations.

company through the preliminary title report that the property was subject to an assessment in the amount of $13,000.

In Empire Development Co. v. Title Guarantee & Trust Co., 225 N.Y. 53, 121 N.E. 468 (1918), the New York Court of Appeals (per Justice Andrews) held that the insured had suffered a "loss" under a similar policy of title insurance even though the insured had knowledge of a lien (not excluded by the policy) before the policy was issued. The court reasoned as follows (121 N.E. at 470):

"Failure to keep what a man has or thinks he has is a loss. What the word means is to be measured by the standard accepted between the parties. As a help to our decision we must examine the purpose and object of the contract. To a layman a search is a mystery, and the various pitfalls that may beset his title are dreaded, but unknown. To avoid a possible claim against him, to obviate the need and expense of professional advice, and the uncertainty that sometimes results even after it has been obtained, is the very purpose for which the owner seeks insurance. To say that when a defect subsequently develops he has lost nothing and, therefore, can recover nothing, is to misinterpret the intention both of the insured and the insurer. In no sense is the contract a mere wager. Such a contract so made and understood by the parties should be enforced. . . . It seems to be assumed that loss or damage would be received when, because of a defect in the title, the insured was bound to pay something to make it good. That is the present risk of loss inseparable to every contract of insurance."

Here Mr. Smith, as of the date of the policy, was bound to pay $13,000 to make his title good. The policy had guaranteed that the title was free of any such burden. Although a portion of his monthly payment to the mortgagee was applied to a yearly payment on the assessment, the jury found that Mr. Smith did not know this. Accordingly, we hold that the jury was justified in concluding that Mr. Smith had suffered a $13,000 "loss" within the terms of the policy.[3]

■ Appellant next contends that the trial court erred in awarding plaintiff attorneys' fees in the amount of $2,500. Generally attorneys' fees are not recoverable unless provided for by statute or by agreement of the parties. U. S. Fidelity & Guaranty Co. v. Frohmiller, 71 Ariz. 377, 227 P.2d 1007 (1951); State v. Williams, 12 Ariz.App. 498, 472 P.2d 109 (1970). We have found no statute authorizing the recovery of attorneys' fees by an insured in a successful suit against his insurer. Neither have we found any provision in the policy authorizing such recovery in a suit brought by the insured. There is no reason why a suit on an insurance policy would call for an exception to this general rule. We therefore find the award erroneous.

■ The company also asserts that it was error for the court to award prejudgment interest on the amount of the $13,000 awarded as damages.[4] The interest was assessed as of the date plaintiff made demand on the company for payment. It is well established in this jurisdiction that prejudgment interest can be awarded on a liquidated claim. Tri-State Insurance Company v. Maxwell, 104 Ariz. 574, 457 P.2d 251 (1969); Floral Lakes, Inc. v. Patton, 20 Ariz.App. 383, 513 P.2d 672 (1973); Arizona Title Insurance & T. Co. v. O'Malley Lumber Co., 14 Ariz.App. 486, 484 P.2d 639 (1971). The company argues that the amount of the assessment was un-

---

3. See Annot. 60 A.L.R.2d 972, 984 (1958) for a collection of cases dealing with the measure of damages under a title insurance policy when the loss results from an encumbrance.

4. Although the actual amount due on the assessment as of closing was $12,999.04, both parties stipulated that any verdict in excess of that amount would be reduced to that sum. Since the verdict was for $13,000, the company apparently did not bother to move to reduce it.

378

liquidated. In Arizona Title Insurance & T. Co. v. O'Malley Lumber Co., supra, Division One of this court employed the following definition of a liquidated claim taken from McCormick on Damages, § 54:

"A claim is liquidated if the evidence furnishes data which, if believed, makes it possible to compute the amount with exactness, without reliance upon opinion or discretion." (14 Ariz.App. at 496, 484 P.2d at 649).

Since the company's agent who erred in preparing the preliminary title report testified that the assessment balance in May, 1966 (the month of closing) was $12,999.-04, we hold that the above test is satisfied and therefore reject any assertion that the amount due was unliquidated.

Finally, the company claims that the trial court erred in giving certain instructions and refusing to give others. After reviewing the instructions given, we conclude that they accurately stated the law and that they would not cause the jury to be prejudiced.

The judgment below is affirmed except as to the award of attorneys' fees.

KRUCKER and HOWARD, JJ., concur.