**FIRST NATIONAL BANK OF MINNE-APOLIS, a National Banking Association, Plaintiff,**

**v.**

**FIDELITY NATIONAL TITLE INSUR-ANCE COMPANY, a Nebraska Corporation, Defendant.**

Civ. No. 76–0–193.

United States District Court, D. Nebraska.

Jan. 10, 1977.

Frank F. Pospishil, Omaha, Neb., for plaintiff.

Robert J. Becker, Omaha, Neb., for defendant.

DENNEY, District Judge.

This matter comes before the Court upon cross-motions of the parties for summary judgment [Filings # 19, 21] subsequent to a hearing before the Court on December 7, 1976.

Plaintiff, First National Bank of Minneapolis [hereinafter referred to as the Bank],

instituted this action for a declaratory judgment to determine the liability of defendant, Fidelity National Title Insurance Company [hereinafter referred to as Fidelity Insurance] under the provisions of defendant's mortgagee policy of title insurance issued to plaintiff. Jurisdiction is based on diversity of citizenship, 28 U.S.C. § 1332, the Bank being a citizen and resident of Minnesota and Fidelity Insurance being a citizen and resident of Nebraska. The parties have conducted extensive discovery which reveals the following undisputed facts.

Dial Investment Company, Inc., not a party to this litigation, owned an option to purchase certain real estate known as Winchester Heights, located in Omaha, Nebraska, from Anna C. Klinker, John Klinker and Marvely J. Klinker, for approximately $390,000.00. On April 4, 1974, the Bank and Dial entered into a Building Loan Agreement providing for interim construction financing up to $1,300,000.00 for the development of Winchester Heights and thereafter the Building Loan Agreement was secured by a promissory note from Dial in the amount of $1,300,000.00 and a mortgage. On April 22, 1974, Dial purchased the land from the Klinkers and gave them two purchase money mortgages which were recorded on May 13, 1974.

On April 29, 1974, Fidelity Title issued to the Bank a Mortgagee Policy of Title Insurance, insuring that title to Winchester Heights was, as of 8:00 A.M., on April 29, 1974, vested in Dial Investment Company and insuring the Bank against loss or damage, not exceeding $1,300,000.00, sustained by reason of any lien or encumbrance other than those set forth in Schedule B of the policy, affecting title to Winchester Heights.

In February, 1975, Dial defaulted on the loan from the Bank, owing $752,690.28. The Bank commenced mortgage foreclosure proceedings in the District Court of Douglas County, Nebraska, against interested defendants. The Klinkers, defendants therein, counterclaimed against the Bank,

asserting that the Bank's mortgage lien was subject to their prior purchase money mortgages. Fidelity National, after refusing to defend the Bank against the counterclaims pursuant to the title insurance, consented to be bound by the final determination of the various mortgage priorities by the state court. The state court found the Klinker mortgages to be prior to the Bank's. Although the title insurance policy issued by Fidelity National did not list the Klinker mortgages as excluded liens in Schedule B, Fidelity National refuses to acknowledge any liability.

■ Pursuant to the decree in the foreclosure action instituted in the District Court of Douglas County, Nebraska, the real estate involved in this controversy shall be sold on or about March 1, 1977. Plaintiff instituted this action, seeking a declaratory judgment construing the title insurance policy to protect the Bank from any and all damages which the Bank may sustain, not to exceed $1,300,000.00, by virtue of the Klinker mortgages.[1]

Defendant's primary contention is that the policy excludes coverage of plaintiff's claim. The title insurance provides in relevant part as follows:

*Subject to the exclusions from coverage, the exceptions contained in Schedule B* and the provisions of the conditions and stipulations hereof, Fidelity National Title Insurance Company, a Nebraska corporation, herein called the Company, insures as of Date of Policy shown in Schedule A against loss or damage, not exceeding the amount of insurance stated in Schedule A and Costs, attorneys' fees and expenses which the Company may become obligated to pay hereunder, sustained or incurred by the insured by reason of—

1. Title to the estate or interest described in Schedule A being vested otherwise then as stated therein;

2. Any defect in or lien or encumbrance on such title;

.    .    .    .    .

6. The priority of any lien or encumbrance over the lien of the insured mortgage.

[Emphasis supplied].

■ Defendant relies upon paragraph 3 of the "Exclusions From Coverage", which provides in relevant part:

Defects, liens, encumbrances, adverse claims, or other matters (a) created, suffered, assumed or agreed to by the insured claimant; .   .   ..

Fidelity National contends that the uncontroverted facts show that the Bank "agreed to" the liens of the Klinkers. The Bank asserts that this defense is unavailable to defendant.

The uncontroverted facts relied upon by defendant, while somewhat complicated with the details of "high finance" arranged by intelligent businessmen, have been fully developed in depositions, as evidenced by the parties' cross-motions for summary judgments. The Building Loan Agreement entered into between the Bank and Dial on April 22, 1974, for the interim construction financing of Winchester Heights, provides in relevant part as follows:

It is hereby understood and agreed that BORROWER has incurred an indebtedness in the sum of $226,000.00 to Anna C. Klinker and John Klinker ("Klinker"), said indebtedness being secured by a Real Estate Mortgage by and between Dial Construction Company, Inc. and Klinker covering that certain property described in Exhibit "C" attached hereto and made a part hereof. BORROWER hereby represents that it has caused the Title Insurance Company to delete reference to the said Real Estate Mortgage from its Poli-

---

1. It is well settled that in declaratory judgment actions there must be a "substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal and Oil*

*Co.*, 312 U.S. 270, 61 S.Ct. 510, 85 L.Ed. 826 (1941). The imminent sale and the need for plaintiff to know the respective rights and obligations of the parties in order to properly bid at the Sheriff's sale warrants the Court's assumption of jurisdiction.

cy of Title Insurance in favor of LENDER, and has caused the Title Insurance Company to guarantee to LENDER THAT LENDER'S lien is a first mortgage against said property. BORROWER hereby authorizes LENDER to reserve the sum of THREE HUNDRED NINETY THOUSAND AND NO/100 ($390,000.00) DOLLARS to enable LENDER, at any time hereafter, to pay off the said Klinker Mortgage; and BORROWER hereby appoints LENDER its attorney-in-fact for the purposes of paying off such indebtedness to Klinker. Nothing herein contained shall impose upon LENDER any such obligation to pay off the said Klinker Mortgage which would enable the Klinkers to foreclose said Mortgage, shall also constitute a default hereunder.

[Paragraph 29].

The above paragraph culminated from meetings between Dial and the Bank which took place in October or November, 1973. Richard L. Peterson, Assistant Vice President of the Bank, testified in his deposition as follows:

Q. All right. Can you recall what the conversations were at this meeting, and if you can, would you relate to me, please, what the conversations were and who said what?

A. Well, the center of the conversation was a topic which had not been discussed with the bank previous to the meeting, and that was Mr. Karnes [a principal of Dial] inquired of us if we would be willing to provide a wraparound loan rather than a normal loan, which what I mean by "normal loan" is that we would not subordinate our position or wrap around any additional financing.

The reason for his requests as explained to us was that whatever arrangements he had with the owners of the Winchester Heights land at that point in time were willing to accept an interest rate substantially less than what was the proposed interest rate on our interim construction loan.

I think the majority of the time at that meeting was spent discussing the potential of doing the loan in that manner, and it was even—I spent a fair amount of time on the phone talking to both some senior officers of our bank and our legal counsel, the Dorsey law firm, to determine if we could legally do a wrap-around loan because it was my impression that we had never done one in the past.

Q. Now would you explain for me, please, what the term "wrap-around loan" meant, as explained in your meeting with Mr. Karnes and Mr. Hess and Mr. Crowley:

A. To me, and I guess basically it applies to this situation, a wrap-around loan was one where a lender put out money on a subordinate basis to another debt issue with the responsibility and ability to cure defaults and make payments on that superior debt.

Q. All right. Did Mr. Karnes—well, obviously he indicated it was his desire to have this wrap-around done. What did Mr. Karnes tell you about any mortgages which may already be on the property?

A. I don't believe I was specifically told what form of financing was involved or related to that piece of land. We were made aware of the fact that some sort of obligation in relation to that land had been incurred between Dial Investment Company, Inc., and the party that presently owned that land. I was not aware of the fact, whether it was in the form of a mortgage or an option to purchase or some other form of obligation.

Q. But you were aware that, that the superior obligation was there, and I guess the question was whether or not you would wrap around it.

A. The question was whether we were willing to wrap around it.

Q. Right.

A. Some form of debt that was either there or would be there.

Q. All right. Did Mr. Karnes indicate what the total amount of debt was which he asked that you wrap around?

A. The only thing I remember in that relationship was that the amount of debt plus the funds needed to carry that debt over the term of our loan totalled approximately $390,000.00.

. . . . .

Q. Well, prior to that time, were you aware that part of the loan proceeds were going to be used to buy the land?

A. Yes, some of the loan proceeds were to be used to buy the land.

Q. All right.

A. At this point in time, again, let me say that we still had not received a specific cost breakdown as to how the million one fifty of our loan was to be allocated.

Q. All right.

A. We had received some preliminary numbers—

Q. All right.

A. —which were very general.

Q. All right. In concept, how did the—how would the wrap-around differ from how the loan was to proceed originally? Since the loan proceeds were going to be used to pay off the purchase of the land, how did the wrap-around concept differ from what the bank usually did?

A. Obviously, in that type of transaction, there is a small, or maybe not so small additional risk that a lender would take in that there may be problems that relate to the senior debt in a wrap situation that are more difficult for me as a secondary lender to solve.

If we had from day one had a first mortgage position as we do in almost all the interim financing we do, we do not have to contend with any ad-ditional risks. They're all there and we feel we know specifically what risks we're taking.

. . . . .

Q. Well, if the bank were making a straight—if we can call it a straight loan without any wrap-around provi-sions—

A. Uh-huh.

Q. —the bank would expect, would it not, that the purchase of the proper-ty would come out of the initial funding?

A. Yes, that would be normal.

Q. All right. In the proposed wrap-around, the purchase of the land would not come out of the initial funding, but would be reserved to the end, isn't that correct?

A. That would be normal, also.

Q. All right. And you indicated Mr. Karnes had obtained a low interest rate from the owners of the property at 7 percent—well, did he say 7 per cent?

A. I don't remember.

Q. Or you haven't established that?

A. I don't remember what the rate was. It was an attractive rate compared to three and a half percent over prime.

Q. On $390,000.00?

A. I don't know that three ninety was the amount of principal.

Q. All right.

A. I assumed it was less than that. What he was buying the land for, I was under the assumption that was less than three ninety; that included the carrying factor.

Q. All right. So that he was trying to save interest by carrying the owner's indebtedness to the end of the dis-bursement of the proceeds?

A. That appeared to be his objective. [22:2–27:21].

The testimony of the others present at the meeting, Thomas Crowley, Vice President of Heitman Mortgage Company, and Peter Hess, attorney for the Bank, is to the same effect.

The Court therefore finds that Karnes had requested the Bank in October or November of 1973 to withhold $390,000.00 until completion of development, at which time Dial would use the $390,000.00 to pay the loans to the Klinkers with the objective of Dial saving interest on the difference between the interest rate charged by the Klinkers and the rate of the Bank at 3½% over the prime interest rate of 11½%.

The deposition testimony of Peter Hess, attorney for the Bank, sheds further light on why the policy issued by Fidelity National did not reflect the Klinker mortgages.

Q. But it was your understanding then, from whatever sources, that the title company was going to give you, or—I say "you" in the term of Heitman, yourself and the bank—a clean title insurance policy and delete reference to the Klinker real estate mortgages?

A. That's correct.

[19:18–19:24].

In order to understand the necessity of "clean" title insurance, certain background information is necessary. Heitman Mortgage Company is a mortgage loan broker or a company which locates lenders and potential borrowers for a fee. In construction work, there are usually two classes of lenders: a short term or "interim" lender and a long term lender. A short term lender is one who takes the risk of a loan during construction or development. After development, the loan is assigned to or purchased by a long term lender willing to take the long term risk of repayment. Both short term commitments and long term commitments are entered into by the developer prior to the commencement of any work on the tract of land. In the case at hand, the Bank was the short term lender and Ford Motor Credit Company was the long term lender. Thomas Crowley, Vice President of Heitman Mortgage Company, explained the necessity of delivering a "clean" title policy.

Q. . . .

To your knowledge was there a later conversation that you were involved with that discussed a title insurance policy?

A. I'm sure there was some conversation.

Q. Do you recall what the conversations were?

A. Well, the importance of delivering a clean title to Ford Motor Credit Company.

.        .        .        .        .

Q. Why was it necessary to have a clean title policy to Ford Motor Credit?

A. They wouldn't accept it on any—they wouldn't accept a loan under any other condition, among others.

Q. So irrespective of what the, the title condition of the real estate was, you had to have a clean title policy to give to Ford?

A. That's correct.

[22:21–23:14].

Although Peterson testified that he was subsequently informed by Hess that the "wrap-around" concept had been dropped and that the Bank would have a first mortgage on the property, the Bank did not rely on the title insurance policy to advise it of the true state of the record title. The Building Loan Agreement was executed on April 22, 1974, the title insurance policy was issued on April 29, 1974, and prior to the issuance of the insurance policy $573,500.00 had already been disbursed pursuant to the pending disbursement clause of the Agreement.

## CONCLUSIONS OF LAW

The framework from which a federal court must pass upon a motion for summary judgment is well established.

Summary judgment should be entered only when the pleadings, depositions, affidavits, and admissions filed in the case "show that [except as to the amount of damages] there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c) Fed.R.Civ.P. This rule authorizes summary judgment "only where the moving party is entitled to judgment as a matter of law, where it

is quite clear what the truth is, . . . [and where] no genuine issue remains for trial . . . [for] the purposes of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 728, 88 L.Ed. 967 (1944); *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962).

In passing upon such a motion, the Court is required to view the facts in the light most favorable to the party opposing the motion and to give to that party the benefit of all reasonable inferences to be drawn from underlying facts. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 153–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Oskey Gasoline & Oil Co. v. Continental Oil Co.*, 534 F.2d 1281 (8th Cir. 1976); *Hanke v. Global Van Lines, Inc.*, 533 F.2d 396, 397 (8th Cir. 1976).

While a party who moves for summary judgment has a heavy burden of persuasion, nevertheless, his motion should be granted if the Court is satisfied to the requisite degree of certainty that the record presents no genuine issue as to a material fact and that the movant is entitled to judgment as a matter of law. As the Court of Appeals for the Eighth Circuit stated in *Lyons v. Board of Ed. of Charleston, etc.*, 523 F.2d 340, 347 (8th Cir. 1975):

Thus, although we have repeatedly emphasized that summary judgment is an extreme remedy, not to be employed unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recovery under any discernible circumstances, *Ozark Milling Co., Inc. v. Allied Mills, Inc.*, 480 F.2d 1014 (8th Cir. 1973) and cases therein cited, we recognize as well its salutary purpose in avoiding a useless, expensive, and time consuming trial where there is no genuine, material fact issue to be tried.

This being a case founded upon diversity of citizenship, the Court is, of course, bound to apply the substantive law of the State of Nebraska. To the extent that the Nebraska Supreme Court has not been presented with certain issues, the Court must turn to other decisional law for guidance as to how the highest court of this state would, most likely, rule on the issues presented.

The rules of construction which apply to insurance policies are familiar. The terms used in the policy must be given their plain and ordinary meaning. *Wyatt v. Woodmen Accident and Life Company*, 194 Neb. 614, 234 N.W.2d 217 (1975); *Brander v. Eagle Raceways, Inc.*, 187 Nev. 508, 192 N.W.2d 142 (1971). The insured may not be deprived of his rights by a narrow and technical construction of the policy by the courts, but a liberal and reasonable construction must be given. *Otteman v. Interstate Fire & Casualty Company*, 172 Neb. 574, 111 N.W.2d 97 (1961). Furthermore, a contract of insurance is not only to be liberally construed, but is to be construed in favor of the insured and strictly against the insurer, with all doubts resolved against the insurer. *Beister v. John Hancock Mutual Life Insurance Co.*, 356 F.2d 634 (8th Cir. 1966). If there is any ambiguity in the language used in the policy, it should be construed most strictly against the insurance company which is responsible for the language. *In re Estate of Tichota*, 191 Neb. 484, 215 N.W.2d 885 (1974).

In *Lawyers Title Insurance Corp. v. Research Loan & Investment Corp.*, 361 F.2d 764 (8th Cir. 1966), the Eighth Circuit held that an insured could not recover on a title insurance policy providing that encumbrances assumed or agreed to by the insured are not covered by the policy, where the insured assumed by deed all existing obligations, did not rely on an insurer to advise it of encumbrances, and it had had reason to believe that the prior owners had placed encumbrances on the realty. The insured therein, Research, took title by deed which recited as follows:

Grantee accepts property described above subject to mortgages, liens, and indebted-

ness of all nature, and agrees to make payment on same, without any recourse against Grantors.

The court held in applying the exception from coverages of defects or encumbrances "created, suffered, assumed or agreed to by the Insured,"

in this case the application for title insurance was made after the deal had been closed and there is no evidence showing that Research was relying on the title insurer to advise it of encumbrances. The only possible conclusion is that the "assumed or agreed to" condition applies to the four Berg deeds of trust since Research did assume by deed all existing obligations, did not rely on the title insurer to advise it of encumbrances, and did have reason to believe the prior owners had placed such encumbrances on the property. *Id.* at 769.

Significantly, the Eighth Circuit stressed that the policy exclusion clauses, "if they are to be given effect, do not necessarily require a finding of actual knowledge of the defects or encumbrances." *Id.*

"The words 'assumed or agreed to' [have] reference to some particular defect or incumbrance assumed or agreed to by the bank by the title conveyance to it or by some collateral agreement made by the bank with reference to that specific subject matter." *National Bank & Trust v. New York Title Insurance Co.*, 171 Misc. 854, 12 N.Y.S.2d 703 (1939). As in *Lawyers Title Insurance Corp. v. Research Loan and Investment Corp.*, *supra*, the officers of the Bank "were experienced in the real estate business and it taxes credulity to contend that they did not intend to assume obligations which they reasonably surmised had been placed against the property." 361 F.2d at 769. Despite Peterson's testimony that he would not have disbursed any funds under the loan agreement in the absence of the title insurance policy insuring the first mortgage lien on the Bank, this misplaced reliance based upon the conduct of the parties cannot justify recovery. The very language of the loan agreement states that Dial "has caused the Title Insurance Com-

pany to guarantee to Lender that Lender's lien is a first mortgage against said property." The "tangled web" weaved by the parties to the loan transactions in October or November, 1973, was an unconscionable scheme for which defendant cannot be held liable.

The foregoing shall consist of findings of facts and conclusions of law in accordance with Rule 52(a), Fed.R.Civ.P.

Judgment shall be entered for defendant.