452 So.2d 35 (1984)
FIRST AMERICAN TITLE INSURANCE COMPANY, Appellant,
v.
Harold KESSLER, Appellee.
No. 83-946.
District Court of Appeal of Florida, Third District.
May 8, 1984.
Rehearing Denied in Part, Rehearing Granted in Part, Opinion Clarified June 26, 1984.
*36 Taub & Williams and Theodore C. Taub, Tampa, for appellant.
Podhurst, Orseck, Parks, Josefsberg, Eaton, Meadow & Olin and Joel D. Eaton, Miami, for appellee.
Before HUBBART, NESBITT and DANIEL S. PEARSON, JJ.
DANIEL S. PEARSON, Judge.
Convinced that the record reveals genuine issues of material fact, we reverse a summary judgment which determined that First American Title Insurance Company is liable to Harold Kessler, Trustee, the plaintiff below, under policies issued by First American insuring Kessler's title to certain real property.

I.
The properties in question are five apartments in a building which had been converted into a condominium by its then owner, Brickell Biscayne Associates (BBA). These apartments were sold by BBA to a foreign corporation called Transiera Corporation. At the closing of this transaction, a paralegal of Cohen, Angel & Rogovin,[1] the law firm representing the seller, made a $6,700 mistake in Transiera's favor. When the mistake was discovered, requests for reimbursement were made on Transiera's attorney, and when reimbursement was not forthcoming, BBA sued Transiera to recover the money.
In attempting to effectuate service of the complaint against Transiera, Terry Schwartz, the associate in Cohen, Angel & *37 Rogovin charged with the responsibility of this litigation, encountered problems. He learned that Transiera was not registered to do business in the state, had no registered agent, and had not registered under the RICO Act as an alien corporation. A real estate company which collected rents for Transiera refused to accept service on Transiera's behalf. Transiera's attorney did the same, stating that he was not authorized to accept service for the company. Schwartz was informed by Transiera's attorney that all the principals of Transiera were Latin and were in Spain at the time. Ultimately, Schwartz chose to effect service by the publication of a notice of action, supporting such service by his affidavit of diligent search and inquiry. Schwartz sent a courtesy copy of the complaint to Transiera's attorney. When Transiera failed to respond to the complaint a default, followed by a final judgment of foreclosure as to the debt owed, was entered against Transiera. A foreclosure sale for Transiera's five apartments was scheduled.
At this point, Gary Quateman, an employee of First Condominium Development, the subsidiary of BBA charged with overseeing the conversion of the apartment building into condominiums, and his personal friend, Michael Friedman, an associate in Cohen, Angel & Rogovin, got together to discuss making a bid on the apartments at the foreclosure sale.[2] Friedman suggested that they bring one Harold Kessler, a firm client and a person knowledgeable in real estate matters, into their plan.[3] Quateman approved, and on April 6, 1982, the three entered into a trust agreement, which instrument named Kessler as trustee and Quateman, Friedman and Kessler as beneficiaries; authorized the expenditure of up to $200,000 to purchase the five Transiera apartments; set forth their respective interests as Quateman fifty per cent, Kessler twenty-five per cent, and Friedman twenty-five per cent; and provided that the trust would terminate on April 17, 1982. On April 7, 1982, Kessler purchased the five units at the foreclosure sale for $9,000. On April 20, 1982, Kessler wrote and signed, individually and as trustee, a letter agreement setting forth his understanding of the ownership and management arrangements concerning the five units. The record reveals that Kessler signed this letter, but is silent as to whether Friedman signed it or Quateman ever saw it.
Shortly after the expiration of the period for redemption of the foreclosed properties, Friedman told Kessler to purchase title insurance covering their new acquisitions.[4] Kessler went to his personal lawyer, who declined to issue the policies, because the risk was too great in this type of foreclosure. Kessler then went to Audrey Smith of Omni Title Insurance Company, the issuing agent for the appellant, First American. Kessler told Smith what he had paid for the properties and what they were worth. He gave her the title insurance policies previously issued to Transiera which he had obtained from Friedman and which showed the value of the properties as $478,400. Kessler gave Smith no other information. Smith had the abstract of title updated and on April 28, 1982, issued title policies on First American effective April 20, 1982, to Harold Kessler, Trustee, insuring the titles for $478,400.
A little less than two months later, the Circuit Court set aside the default, the final judgment, and the foreclosure sale, holding that (a) the suit against Transiera was a mere breach of contract action which would not give rise to an equitable lien on the properties or occasion service by publication; *38 (b) even were service by publication authorized, the affidavit in support thereof was deficient and inadequate; and (c) Transiera had shown both excusable neglect and meritorious defenses requiring that the default, and all that followed, be set aside. Kessler, having been thus divested of title and having received no satisfaction from First American, sued to recover the total face amount of the policies, namely, $478,400. First American defended on the ground that Kessler's loss was excluded from coverage. The trial court entered summary judgment for Kessler, and this appeal ensued.

II.
The title insurance policies are identical. The provision of each upon which First American relies reads:
"The following matters are expressly excluded from the coverage of this policy:
... .
"3. Defects, liens, encumbrances, adverse claims, or other matters (a) created, suffered, assumed or agreed to by the insured claimant; (b) not known to the company and not shown by the public records but known to the insured claimant either at Effective Date of Policy or at the date such claimant acquired an estate or interest insured by this policy and not disclosed in writing by the insured claimant to the company prior to the date such insured claimant became an insured hereunder; ..."
An "insured claimant" is defined in the subject policies as "an insured claiming loss or damage hereunder." An "insured," in turn, is defined as:
"the insured named in Schedule A, and, subject to any rights or defenses the Company may have had against the named insured, those who succeed to the interest of such insured by operation of law as distinguished from purchase including, but not limited to, heirs, distributees, devisees, survivors, personal representatives, next of kin, or corporate or fiduciary successors."
Unquestionably, the insured named in Schedule A is "Harold Kessler, Trustee." However, the trust agreement between Kessler, Friedman and Quateman expired on April 17, 1982, three days before the effective date of the title insurance policies. The fact that the purpose for which a trust is created may not have been fully accomplished does not serve to extend the duration of the trust in the face of a clear and unambiguous provision in the trust instrument fixing the trust's duration. See Johns v. Townsend, 160 Fla. 213, 34 So.2d 565 (1948); Ginsburg v. Katz, 303 So.2d 340 (Fla. 3d DCA 1974). Thus, the relationship of Kessler, Friedman and Quateman as of the effective date of the title insurance policies is far from clear. There is nothing in this record to indicate that a corporation, which, according to the trust instrument, was to be formed, was actually formed. There is no suggestion, much less a clear demonstration, that Kessler's letter proposal of April 20 to Friedman and Quateman was agreed to by them, nor is it clear from the letter that Kessler was to hold the property as trustee. Plainly, the mere fact that Kessler signed the letter as trustee does not make him one or create a trust. See Willey v. W.J. Hoggson Corp., 90 Fla. 343, 106 So. 408 (1925). In sum, because the nature of the relationship between Kessler, Friedman and Quateman as of April 20, 1982, is not conclusively shown by this record, the possibility exists that as of the effective date of the policy the relationship between them was such  whether partners, tenants in common, or other  that the three had succeeded to the interest of the named insured by operation of law so as to become the insured as defined in the policy. If the relationship between the three were found to be such that the law would make Kessler responsible for the acts of Friedman and Quateman, then, because, as we will later discuss, there is a genuine issue of fact as to whether Friedman assumed or agreed to *39 the defect in title,[5],[6] Kessler, in turn, can be said to have assumed and agreed to the defect so as to make the defect excluded from coverage.
"Assumed" and "agreed to" as used in a title policy have "reference to some particular defect or incumbrance assumed to or agreed to by the [insured] by the title conveyance to it or by some collateral agreement by the [insured] with reference to that specific subject matter." First National Bank of Minneapolis v. Fidelity National Title Insurance Co., 425 F. Supp. 105 (D.Neb. 1977), reversed on other grounds, 572 F.2d 155 (8th Cir.1978). Defenses based on this exclusion "do not necessarily require a finding of actual knowledge of the defects or encumbrances...."[7]Lawyers Title Insurance Corp. v. Research Loan & Investment Corp., 361 F.2d 764, 769 (8th Cir.1966). But see Arizona Title Insurance & Trust Co. v. Smith, 21 Ariz. App. 371, 519 P.2d 860, 863 (1974) ("[O]ur policy of construing ambiguities in favor of the insured leads us to require actual knowledge on the part of the insured as to the full extent and amount of the assessment before the exclusion would become operative." (emphasis in original)). In the present case, the depositions raise the question of whether Friedman knew enough about the quality of service of process to create a genuine issue of fact whether he assumed or agreed to the defect that actually resulted in the loss of good title to the property.[8]
Additionally, we are of the view that Kessler has not conclusively shown that his failure to reveal to the insurance company that his personal attorney refused to issue title insurance policies, a fact which Kessler, *40 by his own admission, actually knew, did not constitute a fraudulent concealment of a material fact which would vitiate the contract.
We decide, therefore, that because the record does not conclusively show that Friedman did not assume or agree to the defect in title or that Friedman and Kessler were not partners as of the effective date of the policy[9] so as to prevent Friedman's assumption and agreement of the defect from being imputed to Kessler,[10],[11] or that the contract is not void due to Kessler's alleged fraudulent concealments, the entry of summary judgment in favor of Kessler must be reversed and the cause remanded for a trial of these issues.
We have considered the parties' remaining arguments and find them to be without merit.
Reversed and remanded for further proceedings.
NOTES
[1] Subsequently, Cohen, Rogovin, Reid & Ivans.
[2] Both Quateman and Friedman testified in deposition that they received the permission of their respective employers to go forward with their plan to bid on the property at the foreclosure sale. But see n. 8, infra.
[3] The stated reason for involving Kessler was that Quateman by this time was living elsewhere, and Friedman was too busy to do the necessary legwork.
[4] Although Friedman himself was a title insurance agent, he did not offer to write the policy.
[5] There does not appear to be any evidence to indicate that Friedman "created" or "suffered" the defect. "Create" as used in a title insurance policy "refers to a conscious, deliberate causation or an affirmative act which actually results in the adverse claim or defect." Laabs v. Chicago Title Insurance Co., 72 Wis.2d 503, 241 N.W.2d 434, 439 (1976). See Arizona Title Insurance & Trust Co. v. Smith, 21 Ariz. App. 371, 519 P.2d 860 (1974); Feldman v. Urban Commercial, Inc., 87 N.J. Super. 391, 209 A.2d 640 (1965). Cf. Hansen v. Western Title Insurance Co., 220 Cal. App.2d 531, 33 Cal. Rptr. 668 (1963). The term "suffers" as used in a title policy "implies the power to prohibit or prevent the [defect] which has not been exercised although the insured has full knowledge of what is to be done with the intention that it be done." Arizona Title Insurance & Trust Co. v. Smith, 519 P.2d at 863. See Feldman v. Urban Commercial, Inc., 209 A.2d at 648.
[6] Although, in our view, there also exists a genuine issue of fact as to whether Friedman knew of the defect, we think the language of the policy itself would preclude Friedman's knowledge from being imputed to Kessler, even if their relationship would permit the imputation. The policy defines "knowledge" as "actual knowledge, not constructive knowledge or notice which may be imputed to an insured, by reason of any public records." Construing, as we must, this arguably ambiguous definition in favor of the insured, McDaniel v. Lawyer's Title Guaranty Fund, 327 So.2d 852 (Fla. 2d DCA 1976), we conclude that Friedman's knowledge cannot be imputed to Kessler. See Arizona Title Insurance & Trust Co. v. Smith, 519 P.2d 860 (where actual knowledge required, no imputation of knowledge, as from agent to principal, can bar recovery under title policy). That being the case, it is unnecessary for us now to address whether the defect was known to the company or shown by the public records. However, although the record now before us does not show Kessler's actual knowledge of the defect, nothing we have said herein shall preclude First American from attempting to show Kessler's actual knowledge in the further proceedings to be conducted. If such a showing is made, then whether the defect was known to the company or shown by the public records will become an issue.
[7] The knowledge required for a determination that Friedman assumed and agreed to the defect is defined by case law, not the title insurance policy. Cf. n. 6, supra.
[8] According to Stanley Angel, a partner in the firm, he went in to see Friedman after final judgment against Transiera had been entered and expressed concern as to what efforts had been made to effectuate service, since it seemed to him strange that $500,000 apartments were being forfeited over a $6,700 mistake. Angel said he believed the firm had addresses for Transiera's principals in the files. According to Angel, Friedman pleaded total ignorance. Angel also said a look at the file did not alleviate his fears as to improper service. Angel further testified that when he learned of Friedman's intention to purchase the properties at the foreclosure sale, he urged Friedman not to get involved and warned him that if he did and it resulted in adverse publicity to Angel or the firm, he would fire Friedman.
[9] This negative burden is upon the insured at this juncture of the proceedings. At trial, however, since the general rules respecting burden of proof on insurance policies apply as well to actions on title insurance policies, it will be the insurer's burden to prove that "a defective title is within an exception to the liability of the insurer." 46 C.J.S. Insurance § 1321(g), at 460 (1946).
[10] Section 620.615, Florida Statutes (1981), provides:

"Notice to any partner of a matter concerning partnership affairs, and the knowledge of the partner acting in the particular matter, acquired while a partner or then present in his mind, and the knowledge of any other partner who reasonably could and should have communicated it to the acting partner, operate as notice to or knowledge of the partnership, except in a case of fraud on the partnership committed by or with the consent of that partner."
While the general rule appears to be that an innocent insured  here, arguendo, Kessler  will not be precluded from recovering under an insurance policy to the extent of his interest by the culpable acts of a third person, even his agent, or a co-insured, see Auto-Owners Insurance Co. v. Eddinger, 366 So.2d 123 (Fla. 2d DCA 1979), approved, Everglades Marina, Inc. v. American Eastern Development Corp., 374 So.2d 517 (Fla. 1979); Stromblad v. Hanover Fire Insurance Co., 121 Misc.Rep. 322, 201 N.Y.S. 67 (1923); Pleasant v. Motors Insurance Co., 280 N.C. 100, 185 S.E.2d 164 (1971); Aetna Insurance Company v. Carpenter, 170 Va. 312, 196 S.E. 641 (1938); Hedtcke v. Sentry Insurance Co., 109 Wis.2d 461, 326 N.W.2d 727 (1982), this rule is limited to cases where there is no question concerning coverage under the insurance contract and where the sole question is whether the culpable act of the third person which violates a provision of the contract forfeits the right of an innocent insured or beneficiary to recover under the contract. Thus, even if one partner's culpable act committed after the contract of insurance was formed can be said not to forfeit another partner's right to recover under the policy, where one partner assumes or agrees to a defect, other partners cannot recover because no contract exists which covers that defect.
[11] If the relationship between Friedman, Kessler and Quateman as of the effective date of the policy was not that of partners, but rather tenants in common, then there will be no basis upon which Friedman's assumption of and agreement to the defect, even if proved, can be imputed to Kessler. In such a case, the interests of the insureds must be viewed as several in the absence of clear language in the policy to the contrary, Auto-Owners Insurance Co. v. Eddinger, 366 So.2d 123, and thus, Kessler's recovery could not be barred, even if Friedman's could be, see Hedtcke v. Sentry Insurance Co., 326 N.W.2d 727.