**REGIONS BANK, Plaintiff,**

v.

**COMMONWEALTH LAND TITLE INSURANCE COMPANY, Defendant.**

**Case No. 11–23257–Civ.**

United States District Court,
S.D. Florida,
Miami Division.

Sept. 18, 2013.

Brian P. Yates, David Stuart Garbett, Joseph David Perkins, Gary Thomas Stiphany, Garbett, Stiphany, Allen & Roza, P.A., Miami, FL, for Plaintiff.

Jeffrey Clark Schneider, Stuart Isaac Grossman, Levine Kellogg Lehman Schneider & Grossman LLP, Jezabel Llorente, Jezabel Llorente, P.A., Miami, FL, for Defendant.

### VERDICT AND ORDER FOLLOWING NON–JURY TRIAL ON DEFENDANT'S REFORMATION CLAIM

ROBERT N. SCOLA, JR., District Judge.

This case arises out of a failed plan to develop residential housing on a tract of land in Fort Myers, Florida during the height of the real estate boom in 2006. When the real estate market crashed prior to the development of the land, the mortgage on the property went into default and Plaintiff Regions Bank ("Regions"), mortgagee, brought a foreclosure action in state court in Lee County, Florida. *See Regions Bank v. Prime Enters., LLC,* et al., Case No. 10–CA–057197 (Fla. 20th Cir. Ct.2010) Defendant Commonwealth Title Insurance Company ("Commonwealth") had issued a title policy ("Policy") insuring Regions's interest in the property. When a dispute arose with a defendant in the state court litigation, Regions asked Commonwealth to defend it in the case and to indemnify it against any losses. Commonwealth disputed its duty to defend and indemnify so Regions brought this declaratory judgment action seeking a determination of its rights under the Policy. Endorsement 5 of the Policy, as written, is unequivocal and would require that Commonwealth defend and indemnify Regions. However, Commonwealth claims that there was a mutual mistake in the preparation of Endorsement 5 and, as part of its counterclaim in this case, Commonwealth seeks reformation of the terms of Endorsement 5.

The Court held a non jury trial on the reformation claim. The parties subsequently submitted proposed findings of fact and conclusions of law which the Court has carefully reviewed.

After considering the credible testimony and evidence and the applicable law, the Court finds that Commonwealth has failed

to meet its burden of proof; Commonwealth has failed to establish a mutual mistake by clear and convincing evidence. Therefore, for the reasons more fully set forth below, the Court finds in favor of Regions and against Commonwealth on the reformation claim.

## I. FINDINGS OF FACTS

### Introduction

The facts of this case have to be viewed through the lens of the players in the real estate market bubble of the mid–2000's. Property prices were skyrocketing; interest rates were at all-time lows; developers were scrambling to snatch up parcels of land before their competitors got them; banks were loaning huge sums of money in a haphazard way, certain that their interest in the property would be protected by the continued rise in real estate prices. It was in this atmosphere of "irrational exuberance" that multi-million dollar real estate transactions were taking place quickly and without appropriate oversight and caution and care. It is against this backdrop that the actions of the parties in this case must be viewed. While one might think and hope that participants in a $36.3 million transaction would exercise the same level of care as a member of the bomb squad defusing a bomb, such was not the case here. And, just like a careless bomb technician, the results of carelessness can be devastating.

It is obvious to the Court that both Regions's attorney and Commonwealth's agent were careless, one might say even reckless, in the way they communicated with each other and reviewed each other's communications, perhaps in their haste to get the deal done. Each sent emails that set forth positions that were diametrically opposed to other positions that they were taking at virtually the same time. Each agreed with propositions set forth in the other's emails that were diametrically opposed to other positions they were taking at virtually the same time. The Court's job to discern the true intent of the parties in light of these contradictory emails is quite difficult. But, at the end of the day, the Court finds that the documents presented to Regions at the time of the closing of the loan unequivocally support Regions's position in this case: the Policy and its Endorsements accurately reflect the understanding and agreement of the parties at the time of the transaction. And, alternatively, if any mistake was ultimately made, it was a unilateral mistake by Commonwealth's agent whose zeal to close the deal, attempts to hide or obfuscate the impact of the density agreement from lenders (or lack of understanding of its true impact on the title to the land), and inattention to detail led to the wording of the Policy and its endorsements, including Endorsement 5. All of these issues were made more likely to arise because of the agent's divided loyalties based upon by his dual roles as attorney for the developer and agent for Commonwealth.

### The Prime Entities

Prime Homes of Portofino Vineyards, Ltd. ("Portofino") is the owner of the Property. Portofino funded its purchase of the Property by receiving a loan from an affiliated entity, Prime Homebuilders, Inc. ("PHI"), to which it gave a mortgage on the Property.

Larry Abbo ("Abbo") is the general partner and a principal of Portofino, the vice president of Prime Homes, Inc. ("Prime Homes"), the manager of Prime Enterprises, LLC ("Prime Enterprises"), and the vice president of PHI.

Portofino, PHI, Prime Homes, and Prime Enterprises are collectively referred to as The Prime Entitles.

*Steven B. Greenfield: attorney, title insurance agent and closing agent*

Attorney Steven B. Greenfield ("Greenfield") represented Abbo and The Prime Entities at all relevant times. Abbo has been Greenfield's client for approximately 18–19 years and is also one of his personal friends.

Greenfield is also a title agent for Commonwealth and wrote the Policy at issue in this case. At all material times, Steven B. Greenfield, Esq. acted as: (1) the principal of Steven B. Greenfield, P.A. (collectively, Greenfield, Esq. and Greenfield, P.A. hereinafter referred to as "Greenfield"), (2) the policy-issuing agent for Commonwealth; (3) counsel to the Prime Entities, and Abbo; and (4) the closing agent for the March 30, 2006 closing of Regions's loan.

*The Density Agreement*

Prior to purchasing the Property, Portofino's related entity, Prime Homes, entered into a Purchase and Sale Contract for Density Units (the "Density Agreement") with the master developer of the Property, Paul H. Freeman ("Freeman."). The purpose of the Density Agreement was to obtain the right, from Freeman, to build an additional 392 units on the Property. Without Freeman's development rights, only 432 units could be developed on the Property pursuant to a Covenant dated December 14, 2004 between Villages of Cypress Islands, LLP and Freeman.

Greenfield and Freeman negotiated and drafted the Density Agreement. Regions was not a party to the Density Agreement.

Greenfield was also the escrow agent under the Density Agreement.

Abbo signed the Density Agreement on behalf of Prime Homes. Prime Homes then assigned its rights under the Density Agreement to Portofino. Because the Density Agreement gave Portofino the ability to purchase additional density for the Property, it increased the Property's value (*i.e.,* if more homes could be built on the Property, the Property could generate more revenue).

The Density Agreement provides that on its effective date, December 10, 2005, the Purchaser was obligated to pay a $100,000 initial deposit to Greenfield as escrow agent; and, within 5 days after issuance of a Development Order on the Property, the Purchaser was obligated to pay a $250,000 second deposit to Greenfield as Escrow Agent. Inexplicably, neither deposit was ever paid.

The Density Agreement also provides that simultaneously with the purchase of the Property, a Memorandum of the Density Agreement would be recorded in the Lee County, Florida Public Records, and that the Memorandum would create a lien on the Property to secure the Purchaser's obligation to pay for excess density utilized by Purchaser following issuance of the Development Order by Lee County approving excess density.

The Density Agreement provides that upon the sale of the first 250 Extra Density Units, Freeman would receive $23,000 per unit and would receive $18,000 per unit upon the sale of the next 200 Excess Density Units.

*Timeline of relevant events*

**2004**

A covenant limiting density on the Property is entered. Each tract of land has a limited number of units that may be built on it.

**2005**

Portofino enters into an agreement to purchase the Property with a closing date of February 14, 2006.

**November 28, 2005**

In an email to Jane Rankin, Esq., counsel for the then-proposed lender Bank of America (the "Rankin Email"), Greenfield explained his understanding of the Density Agreement and the effect of the Memorandum once recorded and relative priorities between the lender's mortgage and Freeman's interest in the Property, as follows:

> Please note that this memorandum will only secure the "additional density." I am seeking bank approval for the mechanism as it will mean the bank's mortgage will be in a second position to the memorandum as to the additional units; *the bank will be in a first position for the land* which is identified in the actual purchase and sale contract. (emphasis added)

Greenfield's explanation was predicated on ¶ 11(A) of the Density Agreement, which reads:

> Prior to the recording of the Memorandum provided for herein above, Purchaser shall diligently use all reasonable efforts to obtain approval from its lender (Bank of America) as to the priority of the Memorandum over the lender's mortgage (Lender's Approval), as that priority relates to the Excess Density.

**Late November or Early December 2005**

Bank of America later declined to provide the requested financing and Abbo immediately began negotiating with Regions for a loan. Greenfield conveyed to Regions the *same understanding* as to the relative priorities that Greenfield had conveyed in the Rankin Email, that Regions would be in first position on the Property superior to any interest of Freeman in the Property, stating that Regions has priority as against Freeman on the land. Greenfield testified that Freeman never acquired a lien on the Property because no excess density units were ever utilized.

Greenfield testified that the wording of the Density Agreement was "designed to give Bank of America comfort that . . . the bank would be in [a] first position as to the land"). Thus, both Freeman and Prime Homes recognized that a proposed lender, initially Bank of America and later Regions, would not agree to make a substantial loan to finance the acquisition and development of the Property unless the lender received a first-priority mortgage lien on the Property superior to Freeman's interest in the Property. Freeman was willing to be in a junior position on the Property to induce the making of a loan to acquire and develop the Property so that excess density units could be eventually approved and utilized.

Abbo concurred with Greenfield's explanation of the relative priorities, testifying that his intent was for Regions to have a first mortgage position on the Property superior to any interest of Freeman in the Property. Abbo's understanding was that Freeman would not acquire a lien on the Property, despite the recording of the Memorandum, until the 433rd unit was sold and, since no excess density units were ever utilized, Freeman had no lien on the Property.

Karen Rundquist, Esq. ("Rundquist"), Regions's outside transactional counsel, similarly testified that Regions' intent was to receive a first-priority mortgage on the Property superior to any interest of Freeman. According to Rundquist, the deal never changed.

**December 10, 2005**

The Density Agreement is executed by Freeman and Prime Homes.

**January 27, 2006**

Commitment for Title Insurance, Order No. 50225430CA, issued by Greenfield for

the interest in the Property vested in Portofino in the amount of $36,300,000 with Regions as Proposed Insured without exception for, or any mention whatsoever of, any interests to be claimed by Freeman in the Property through the Density Agreement, the Memorandum, or otherwise. Greenfield admitted that the Title Commitment was the only one given to Rundquist, the bank's attorney, and was the only commitment that was tendered. Rundquist received the Title Commitment from Greenfield and testified that without a clean Title Commitment, she would not have closed the loan.

Greenfield admitted during the trial that in light of events, it absolutely would have been better practice to have listed the Memorandum on the Title Commitment as an item to be excepted, if in fact Greenfield intended that Freeman's interest in the Property was to be excepted from coverage under the Policy. Commonwealth's Senior Vice President and trial representative, Homer Duvall, III, Esq. ("Duvall"), also conceded that (assuming the Title Commitment was extant) if Greenfield intended to except Freeman's interests on the Property from coverage, Greenfield should have listed the Memorandum and Subordination Agreement as "requirements" on Schedule B, Part 1 of the Title Commitment, with the understanding that they would then become exceptions to coverage once recorded.

### January 27, 2006

On this same date, an Officer Credit Memo was created by Regions setting forth the terms of the Loan Request and the bank's evaluation of the Request.

### February 14, 2006

Portofino closes on the purchase of the Property from Villages of Cypress Island LLP. and acquired fee simple title via Special Warranty Deed. Regions had not yet approved the loan to Portofino, so Portofino borrowed money from another Prime entity and executed a mortgage of $36.3 million in favor of that entity.

### February 14, 2006

Regions's Executive Credit Committee approved the $36.3 million Acquisition and Development Loan to be secured by a "First Real Estate Mortgage." All of Regions's credit approval documents similarly provide that the Loan would be secured by a "First Real Estate Mortgage." Only the Executive Credit Committee could modify the material terms of the Loan approval. Neither Regions's loan officer, Mercedes Montalvo ("Montalvo"), nor Rundquist had authority to make any material changes to the Loan as approved by the Executive Credit Committee. Changing the priority of the expected mortgage from a first-priority to a second-priority mortgage and agreeing to a lender's title policy insuring anything less than a first-priority mortgage would constitute material changes requiring Regions' Executive Credit Committee's approval. Regions's Executive Credit Committee never changed its original approval of the Loan, including its requirement for a first-priority mortgage, and Rundquist drafted all of the loan documents consistent with Regions's credit approval.

Montalvo also advised Rundquist that Regions was to have a first-priority lien position on the Property. Rundquist knew that neither she nor Montalvo had any authority to deviate from, or to change the material terms of, Regions's credit approval.

### February 14, 2006

What did **not** occur on this date: the Memo of the Density agreement was **not** "simultaneously with Purchaser's purchase of the Property ... recorded in the Lee County, Florida Public Records" as required by the terms of the Density

Agreement. Greenfield explained that he intentionally delayed recording the Memorandum because he did not want to "frustrate" Abbo's ability to obtain the acquisition, construction and development loan from Regions: "If we just simply recorded [the Memorandum] right off the bat, before we went ahead and spoke to the lenders, we could frustrate the buyer or borrower's ability to get a loan." Greenfield understood that recording the Memorandum during the time that Abbo was negotiating with Regions would chill the negotiations because Regions would not provide the requested $36.3 million in financing if its mortgage was not going to be a first-priority lien on the Property. Freeman also permitted the delay in recording the Memorandum during the time that Abbo was negotiating the loan with Regions. Greenfield waited until March 31, 2006, the day *after* Regions closed and funded its loan on March 30, 2006, to record the Memorandum in the public records, consistent with Greenfield's understanding that Regions was to receive a first-priority mortgage lien securing the loan ahead of Freeman's interest in the Property, if any.

**February 21, 2006**

Regions issues a Loan Commitment Letter for the Property in which Regions agrees to fund $24,900,000 for an Acquisition and Development Residential Loan and $11,400,000 for a Construction Loan for a total commitment of $36,300,000. The Lender's Commitment provides in pertinent part:

*COLLATERAL:* As collateral for this loan, Borrower agrees to give Bank a first priority Mortgage Lien and UCC security interest on the property described below ("Subject Property") and all tangible and intangible property and property rights of Borrower related

thereto: [Legal Description of Property follows].

Prime Enterprises and Portofino approved the Lender's Commitment and its terms were later incorporated into the Construction Loan Agreement, dated March 30, 2006, delivered at closing. According to Abbo, this requirement of a first-priority lien was consistent with the Rankin Email, *i.e.* that Regions would "be in a first mortgage position for the land."

**March 16, 2006**

Prime Enterprises and PHI conducted an "in-house" transaction concerning the Property under the guidance of Greenfield. Prime Enterprises executed and delivered to PHI two promissory notes totaling $36,300,000, secured by a Florida Real Estate Mortgage, Assignment of Leases and Rents and Security Agreement, executed by Portofino in favor of PHI and encumbering the Property and other personal property collateral.

Commonwealth and Greenfield claim that this internal transaction between Portofino and PHI rendered the Title Commitment null and void because the Title Commitment contemplated a direct loan by Regions without the intervention of an internal transaction. However, Greenfield did not notify Regions in writing or otherwise that he had pulled the Title Commitment which the Court finds was necessary to nullify the Title Commitment. Moreover, as discussed below, Greenfield approved, and Abbo signed on behalf of Portofino, an Affidavit of Owner dated March 30, 2006, in which Abbo referred to the Title Commitment and attested that there had been no changes to title since the effective date of the Title Commitment that could adversely affect the mortgage interest to be insured by Commonwealth in favor of Regions and "[t]here are no matters pending against [Portofino] or the Property that could give rise to a lien that

would attach to the Property between the effective date of [C]ommitment and the actual date of recordation of the documents for the loan transaction." The Court also notes that in August 2006, when Commonwealth authorized Greenfield to issue the Policy, Commonwealth referred to the same number as on the Title Commitment.

### March 17, 2006

Greenfield records the PHI mortgage. At this time, the PHI mortgage is a first lien on the property: "Mortgagor covenants with and warrants to Mortgagee ... (b) that the Premises are unencumbered."

### March 30, 2006

The Consent and Recognition Agreement is executed by Regions, Abbo and Freeman. The Consent and Recognition Agreement, which was drafted by Rundquist with input from Greenfield and Freeman, was required to be executed by Prime Enterprises, Portofino and Freeman as a condition precedent to Regions's making the Loan. Regions made no representations or warranties in the Consent and Recognition Agreement. Rather, in the Consent and Recognition Agreement, Prime Enterprises, Portofino and Freeman made representations and warranties to Regions including, *inter alia*, that the "[Density] Agreement" and the documents referred to therein are the only agreements in effect covering the subject matter thereof. Rundquist included that language—which said nothing about any executed Memorandum or Subordination Agreement—in the Consent and Recognition Agreement so that Regions knew, as of the closing, the instruments that affected the Property.

The Consent and Recognition Agreement does not contain any provisions that address the relative priorities between Freeman and Regions with respect to the Property. To the extent that one can point to any provision that could address the priorities, the recitals indicate that the Loan "is secured by, among other things, a certain Florida Real Estate Mortgage, Assignment of Leases and Rents and Security Agreement (the 'Mortgage') from [Portofino] in favor of [Regions]". Both the PHI Mortgage and Amended Mortgage indicate, on their face, that they constitute a first-priority lien on the Property, and the Density Agreement, also referred to in the Consent and Recognition Agreement, indicates that Portofino was to "use all reasonable efforts to obtain approval from its lender ... as to the priority of the Memorandum over the lender's mortgage (Lender's Approval), **as that priority relates to the Excess Density."**

Commonwealth has pointed to the provisions giving Regions the right (but not the obligation) to cure Portofino's defaults under the Density Agreement addressing Regions's duties as owner of the Property if Regions acquires title. As to the former provisions, the Court concludes that they do not mean that Regions's mortgage lien is junior to any lien on the Property claimed by Freeman; and as to the latter provision, the Court similarly concludes that this provision does not address the relative priorities of Regions's mortgage lien in relation to Freeman's interest in the Property, if any, as this provision addresses Regions's status as eventual owner of the Property, presumably following a foreclosure sale, not as the mortgagee.

Similarly, Regions was not bound by the Density Agreement's reference to Purchaser's causing its title company, at the time of recording of the Memorandum, to issue an endorsement to the title policy insuring title through the recording of the Memorandum to be prior to any mortgages. (*See* Density Agreement ¶ 11 at 11.) This provision refers to an owner's policy, not a lender's policy. In any event, under

the Consent and Recognition Agreement, Regions as lender did not assume any obligations under the Density Agreement including this provision. (Consent and Recognition Agreement at 2, ¶ 2 ("[N]othing [in the Consent and Recognition Agreement] shall require [Regions] to cure [Portofino's] default or to perform any [of Portofino's] act, duty or obligation.").) Moreover, in the very next section of the Density Agreement, Freeman gave Portofino authority before recording of the Memorandum to negotiate with a lender to obtain its approval as to the priority of the Memorandum over the mortgage "as that priority relates to the Excess Density."

**March 30, 2006**

Portofino executed an Amended and Restated Florida Real Estate Mortgage, Assignment of Leases and Rents and Security Agreement on the Property securing Portofino's Guaranty and the Notes ("Amended Mortgage"), amending the PHI Mortgage in favor of Regions. Greenfield recorded the Amended Mortgage on April 28, 2006 in the Public Records of Lee County, Florida. The Amended Mortgage indicates on its face that it is a first-priority mortgage.

Greenfield testified that in fact the PHI Mortgage and Amended Mortgage are first-priority mortgages on the Property. Duvall confirmed that the PHI Mortgage, as amended by the Amended Mortgage, was superior to the Memorandum from a recording perspective.

**March 30, 2006**

Regions received the Construction Loan Agreement. The Construction Loan Agreement indicates that as a condition precedent to any advances, Regions was to receive a lender's policy insuring the priority of the mortgage as a first lien on the Property.

**March 30, 2006**

Portofino executed a Collateral Assignment of Density Units in favor of Regions. The Density Agreement provides that Freeman's lien priority, in relation to a lender's mortgage, was only as to excess density units.

**March 30, 2006**

Abbo executed the Owner's Affidavit, in which he set forth, under oath, *inter alia:*

3. [Abbo] makes this affidavit in order to induce [Regions] to make a loan to [Prime Enterprises] secured by a first mortgage on the Property from [Portofino] in favor of [Regions], and in order to induce Steven B. Greenfield, P.A., as Agent for Commonwealth Land Title Insurance Company . . . to insure the priority of said mortgage.

. . .

6. **The Property is free and clear of all liens,** . . . encumbrances, claims, demands and judgments of every nature, kind and description whatsoever, except for the lien of real estate taxes for the current year and subsequent years.

7. There are no outstanding unrecorded easements, contracts for sale, agreements for deed, deeds, liens or mortgages affecting the Property or any portion thereof.

. . .

16. There has been no change in title to the Property from and after the effective date of [Commonwealth's] title insurance commitment to insure said mortgage in favor of [Regions] which could adversely affect the interest to be insured by [Commonwealth].

17. There are no matters pending against [Portofino] or the Property that could give rise to a lien that would attach to the Property between the effective date of said title commitment and

the actual date of recordation of the documents for the loan transaction.

18. Portofino has not executed and shall not execute any instrument (and has taken no action and shall take no action) that would adversely affect the interest to be insured by [Commonwealth].

### March 30, 2006

On behalf of Portofino and Prime Enterprises, Abbo executed a Cooperation and Compliance Agreement.

In the Cooperation and Compliance Agreement, Abbo acknowledged on behalf of Portofino and Prime Enterprises that Regions was relying on his representations in that document to make the Loan to Prime Enterprises and further represented, under oath, that Portofino "has granted [Regions] a valid first priority mortgage lien on the Property for the total indebtedness under the Mortgage."

Additionally, on March 30, 2006, Portofino and PHI (but not Regions or Freeman) executed a Subordination Agreement, which purported to subordinate the Mortgage to the Memorandum. Greenfield recorded the Subordination Agreement on April 6, 2006 in the Public Records of Lee County, Florida.

Quite significantly, as of the March 30, 2006 closing, despite several requests, Greenfield had not sent to Rundquist the form of Subordination Agreement prepared by Greenfield, and neither Rundquist nor Regions had seen it. Rundquist testified unequivocally that had she known about the Subordination Agreement eventually signed and recorded, Regions would not have closed; "it would have just stopped." The Subordination Agreement is the **only** document for which Greenfield did not have proof of transmittal. The Court finds that the Subordination Agreement was not sent to, nor received by, Regions prior to the closing. The failure to transmit this crucial document allowed Regions to go forward with the closing with no indication in any of the documents relied upon at closing that its mortgage would be inferior to any other liens. Any confusion in the contradictory emails would have been eliminated had the bank received the Subordination Agreement prior to the closing. The Court finds that Regions bank reasonably believed that the Subordination Agreement that was going to be executed by Freeman and Portofino would have made the Density Agreement subordinate to the bank's first mortgage.

### March 30, 2006

Regions closed on the Loan. Following receipt of the loan documents described above (except for the Subordination Agreement), all of which were approved by Greenfield, Regions disbursed to Greenfield as closing agent for further disbursement the loan proceeds and other closing costs including $64,170.39 to Commonwealth and Greenfield as the premium for issuance of the Policy. The closing occurred with different parties at different locations in Miami–Dade, Broward and Palm Beach Counties.

The loan documents indicate, consistent with the intent of Abbo, Greenfield and Regions, that Regions was receiving a first-priority mortgage lien and clean lender's policy securing the priority of that mortgage over all other interests in the Property.

Thus, at closing, Regions received an Assignment of Notes and Mortgage from PHI, which assigned the PHI Mortgage and Notes, as endorsed by *allonges*, to Regions, and which Greenfield recorded on April 12, 2006 in the Public Records of Lee County, Florida. The PHI Mortgage indicates on its face that it is a first-priority mortgage on the Property.

**March 31, 2006**

Greenfield finally recorded the Density Agreement (one day **after** the closing with Regions and 6 days **before** the Subordination Agreement is recorded).

**April 6, 2006**

Greenfield recorded the Subordination Agreement in the Public Records of Lee County, Florida.

**April 12, 2006**

Greenfield recorded the Assignment of Notes and Mortgage.

**April 13, 2006**

Commonwealth returns copy of Construction Loan Agreement ("CLA") to Greenfield. The CLA provides, *inter alia,* that Regions is to receive a lender's policy insuring a first-priority mortgage lien on the Property as collateral for the Loan:

> In addition to being responsible to [Regions] for the proper disbursement of Loan funds, [Commonwealth] will be called upon to insure [Regions] against loss or damage on account of defects in, mechanic's lien upon, or unmarketability of title to the Premises, as well as to insure that the Mortgage at the time of each advance of Loan funds constitutes a valid first lien thereon.

(CLA at 19 at Art. VIII(10); *see also* CLA at 11 at Art. V(2) (requiring delivery to Regions of a lender's policy insuring the mortgage as "a valid first lien on the [Property] ...").) The CLA contemplated a number of disbursements of Loan proceeds. The purpose of Article VIII at (10) was that at each disbursement, Commonwealth would insure that Regions's mortgage lien constituted a valid first lien on the Property.

**April 28, 2006**

This is the extended effective date of the Policy. The Policy does not contain any exception or exclusion for the Contested Interests or any other interest held or asserted by Freeman in the Property. (*See* Policy, Schedule B, Part I.) Moreover, the Policy expressly insures the priority of the lien of Regions' mortgages on the Property as against the Contested Interests and assures that as of April 28, 2006, the Policy's extended effective date, "[t]here are no covenants, conditions or restrictions under which the lien of [Regions'] mortgage[s] ... can be divested, subordinated or extinguished, or its validity, priority or enforceability impaired." (*See* Policy, Endorsement Nos. 5 and 2.)

**Between August 9, 2006 and August 17, 2006**

With an initial effective date of March 17, 2006 at 3:00 p.m., Greenfield issued the Policy, on which PHI was the initial named insured. At or about the same time, Greenfield issued Endorsements No. 1 (Environmental Protection Letter), No. 2 (Florida Endorsement No. 9), No. 3 (Survey Endorsement) and a Revolving Credit Endorsement (collectively, "Initial Endorsements"), all with the same March 17, 2006 effective date. Consistent with the Title Commitment, neither the Policy nor the Initial Endorsements reference, or purport to except or exclude, any interest held or to be held by Freeman, including any of the Contested Interests. Greenfield testified that, as of its issuance and as required by the CLA, the Policy insured Regions for a valid first lien on the Property, without any exception for any interest claimed by Freeman in the Property.

The land referred to in the Policy is the Property, held in fee simple. The Policy insures Regions (by later endorsement):

> against loss or damage, not exceeding the amount of insurance stated in Schedule A [$36,300,000], and costs, attorneys' fees and expenses which [Commonwealth] may become obligated to pay

hereunder, sustained or incurred by the insured by reason of:

1. Title to the estate or interest described in Schedule A being vested otherwise than as stated therein;

2. Any defect in or lien or encumbrance on such title;

. . .

4. Unmarketability of such title;

. . .

6. The priority of any lien or encumbrance over the lien of the insured mortgage; . . .

By letter dated August 9, 2006, Commonwealth authorized Greenfield to issue the Policy in accordance with the Title Commitment previously issued (and relied upon by Regions at closing). Endorsement No. 2, part of the Initial Endorsements issued no later than August 17, 2006, insures Regions against loss or damage sustained by reason of any incorrectness in Commonwealth's assurance that, as of April 28, 2006, the extended effective date of the Policy and recording date of the Amended Mortgage, "[t]here are no covenants, conditions or restrictions under which the lien of the mortgage referred to in Schedule A can be divested, subordinated or extinguished, or its validity, priority or enforceability impaired." (*See* Policy, Endorsement No. 2.)

During trial, Commonwealth argued that the Density Agreement and Memorandum constituted a covenant running with the land, and Regions took the PHI Mortgage and Amended Mortgage "subject to" the Density Agreement and Memorandum. The Court does not agree that Regions took "subject to" either the Density Agreement or the Memorandum. Regions accepted a collateral assignment of Portofino's *rights* under the Density Agreement (but not its obligations except

to pay for the density units as they were being sold if Regions became owner of the Property) as additional collateral for the Loan, but there is no evidence that Regions agreed to subordinate its mortgage lien to Freeman's interest, if any, in the Property. In any event, Endorsement No. 2 expressly assured Regions that as of April 28, 2006, there were no "*covenants*, conditions or restrictions under which the lien of the mortgage referred to in Schedule A can be divested, subordinated or extinguished, or its validity, priority or enforceability impaired." Accordingly, even if the Density Agreement and Memorandum constituted a covenant running with the land, Endorsement No. 2 insures that lien of the PHI Mortgage, as amended by the Amended Mortgage, is superior to any interest of Freeman in the Property.

Moreover, Commonwealth has relied on the existence of the Subordination Agreement to argue that Regions agreed to subordinate its mortgage lien on the Property to Freeman's interest, if any, in the Property. The Court has already found that Regions never saw or agreed to the Subordination Agreement prepared by Greenfield and did not otherwise agree to subordinate its mortgage lien to the interest, if any, of Freeman in the Property. Moreover, under Endorsement No. 2, Commonwealth assured Regions that as of April 28, 2006, there were no "covenants, conditions or restrictions under which the lien of the mortgage referred to in Schedule A can be divested, *subordinated* or extinguished, or its validity, priority or enforceability impaired." (*See* Policy, Endorsement No. 2.) Accordingly, Commonwealth insured Regions against the contention that the Subordination Agreement subordinated the lien of the PHI Mortgage and the Amended Mortgage to Freeman's interest, if any, in the Property.

The Policy requires Commonwealth, "at its own cost and without undue delay, [to] provide for the defense of an insured in all litigation consisting of actions or proceedings commenced against such insured, or defenses ... interposed against a foreclosure of the insured mortgage ... to the extent that such litigation is founded upon an alleged defect, lien, encumbrance, or other matter insured against by this policy." The Title Commitment shows Regions as the proposed insured in the amount of $36.3 million for a title policy insuring a mortgage from Portofino. Commonwealth always knew that the Policy, insuring the PHI Mortgage and Amended Mortgage as a first-priority lien, would be further endorsed to Regions as named insured, as it was the lender making the Loan secured by a first-priority mortgage on the Property. Rundquist prepared the PHI Mortgage because Regions was not ready to close; Greenfield would record the PHI Mortgage and Regions would take an assignment of it at closing.

**August 17, 2006**

Commonwealth issued an Assignment of Mortgage Endorsement to the Policy, reflecting that the Mortgage had been assigned to Regions.

**2008**

Sometime in 2008, Greenfield issued Endorsement No. 4, with an effective date of April 28, 2006, the date of the recording of the Amended Mortgage. The purpose of Endorsement No. 4 was to expressly name Regions as the insured, to bring the effective date of the Policy forward to April 28, 2006, the recording date of the Amended Mortgage, and to expressly insure the Amended Mortgage. Endorsement No. 4 was issued after Steven Goldman, Esq. ("Goldman"), then counsel to Regions, indicated that he could not locate an endorsement bringing the effective date of the Policy forward to the recording date of the Amended Mortgage.

In 2008, but with the same effective date of April 28, 2006, Greenfield also issued Endorsement No. 5 to the Policy, which amended Schedule B, Part II of the Policy. The purpose of Schedule B, Part II, is to list any recorded instruments affecting the title and subordinate to the lien of the insured mortgage.

According to Greenfield, after Goldman received Endorsement No. 4 in 2008, he called Greenfield back. Greenfield transferred the call to a paralegal, Cathy Hogan ("Hogan"), and told Hogan, "talk to him [Goldman], give him what he wants, please, I mean, you know, within reason and let's get this thing done." According to Greenfield, Goldman then dictated Endorsement No. 5 to Hogan, who "typed it up." Greenfield read Endorsement No. 5 quickly, signed and issued it.

Greenfield had dealt with Goldman in many real estate loan transactions. According to Greenfield, Goldman was extremely fastidious and careful in real estate matters, he "would cross a 't' four times and dot an 'i' three times." No matter what Greenfield would send Goldman in a transaction, he had comments to it.

Endorsement No. 5 insures the priority of the lien of Regions's mortgages (both the assigned PHI Mortgage and the Amended Mortgage) in relation to the Contested Interests:

> In addition to the matters set forth in Part I of this Schedule B, the title to the estate or interest in the land described or referred to in Schedule A is subject to the following matters, if any be shown, but the Company *insures that these matters are also subordinate to the lien or charge of the insured mortgage upon the estate or interest.*

1. Memorandum of Existence of Sale and Purchase Agreement for Purchase of Density between Prime Homes at Portofino Vineyards, Ltd., Purchaser, and Paul H. Freeman, as Trustee, as Seller, dated December 10, 2005, and recorded March 31, 2006, under Instrument # 2006000134287.

2. Subordination Agreement between Prime Homebuilders, Inc., Mortgagee, and Prime Homes at Portofino Vineyards, Ltd., Mortgagor, dated March 30, 2006, and recorded April 6, 2006, under Instrument # 2006000141825. This Subordination Agreement subordinates item 1 above.

3. Consent and Recognition Agreement between Prime Enterprises, LLC, Prime Homes at Portofino Vineyards, Ltd., Regions Bank, and Paul H. Freeman dated March 30, 2006, and recorded April 28, 2008, under Instrument # 2006000173790. This Consent and Recognition Agreement is acknowledgement by the parties of their recognition and acceptance of items 1 and 2 above.

All other matters remain the same.

(Policy at Endorsement No. 5 (emphasis and underline in original).) The effect of Endorsement No. 5 was to reiterate expressly that the Policy covers any claim or defense by Freeman that his interest in the Property is superior to the lien of the insured mortgages.

Duvall testified that Endorsement No. 5 is "nonsense" because it purports to insure that Regions's insured mortgages have priority over the Subordination Agreement that in turn subordinates the Mortgage to the Memorandum and Density Agreement. The Court does not agree with Commonwealth's view that Endorsement No. 5 is nonsense. The issue is not what the principals of Commonwealth and its highly skilled attorneys may consider to be "nonsense." The issue is whether Commonwealth's agent, Greenfield, could have had that understanding at the time he drafted the Endorsement 5. Greenfield's understanding in preparing the Subordination Agreement was that Freeman would only have a superior interest in the excess density units, not the Property; and Regions would have the superior rights to and lien against the Property as against Freeman. As Duvall conceded, the Policy only provides insurance in favor of Regions's mortgage lien on the land, and does not insure Regions with respect to its priority as against Freeman on the excess density units. The Court finds that Endorsement No. 5 is consistent with Greenfield's intent to insure the priority of Regions' mortgage lien on the Property in relation to Freeman's interest, if any, on the Property.

**March 9, 2010 & April 10, 2010**

Regions notified Commonwealth by letter of its intent to foreclose and the possibility that Freeman may assert a superior interest in the Property. Regions's notice specifically referenced Endorsement No. 5.

**April 12, 2010**

Following the default under the Loan, Regions entered into a Settlement Agreement with Prime Enterprises, Portofino, Abbo and others ("Settlement Agreement"), providing, *inter alia,* for a consensual foreclosure against the Property. Greenfield negotiated, reviewed and approved of the Settlement Agreement. Under the terms of the Settlement Agreement, Prime Enterprises, Portofino and Abbo represented that "the Loan Documents are valid and binding obligations of obligors." Abbo read this document before signing it. Greenfield believed this to be a true statement when he read it and gave it to Abbo to sign, and still believes it to be a true statement. Moreover, the Settlement Agreement provides that Portofino "is vested with good, marketable and insurable fee simple title to the Prop-

erty free of liens other than the Mortgage and 2010 real estate taxes." Greenfield testified that this was also a true and correct statement and that he approved this language.

**July 13, 2010**

After the Settlement Agreement was executed, Regions provided Greenfield with copies of, *inter alia,* a draft foreclosure complaint and proposed judgment, both of which included Freeman as a junior lienor on the Property. On July 13, 2010, Greenfield approved Regions's draft foreclosure complaint against Freeman, advising Regions's then-litigation counsel by email that the draft foreclosure papers against Freeman and others were "good to go."

**July 23, 2010**

Approximately ten days later, on July 23, 2010, Regions instituted the Foreclosure Action, seeking to, *inter alia,* foreclose Freeman's interest, if any, to the Property. Regions joined Freeman in the Foreclosure Action, alleging that he may claim an interest by virtue of the Contested Interests, but that any such interest is inferior to Regions' lien.

**September 23, 2010**

Freeman moved to dismiss or for more definite statement, contending that, *inter alia,* his interest "and, in particular, the density units and rights accruing therein are superior in right and dignity to any claim made by Plaintiff, Regions Bank" because Regions had notice of the Density Agreement before Regions closed the Loan.

**November 11, 2010**

Regions provided Commonwealth with a copy of Freeman's motion to dismiss.

**December 22, 2010**

By letter, Commonwealth declined to defend or indemnify Regions, without reference to any supposed errors in the Poli-

cy or its endorsements (including Endorsement No. 5) or any need for reformation. Greenfield testified that before this denial letter, he had notified Commonwealth of his mistake in failing to except Freeman's interest from the Policy, including the author of the denial letter, Peter Welch, Esq. However, Duvall testified that Commonwealth has no record of Greenfield ever contacting them in 2010 about the Policy and, had Greenfield done so, Duvall would have expected to see a note of this in the file. Duvall also testified that the mistake in issuing Endorsement No. 5 was "patent" and obvious as soon as he read Endorsement No. 5. However, none of the prior claims representatives at Commonwealth who had investigated and responded to Regions's claim mentioned any mistake in connection with the issuance of Endorsement No. 5.

Nor did Commonwealth base its declination on, or even mention, the Memorandum or Subordination Agreement, but instead claimed only that a Covenant recorded in 2004 ("2004 Covenant") gave Regions notice of Freeman's potential interest, as supposedly acknowledged by Regions through the Consent and Recognition Agreement. But, the Covenant did not create a lien and Duvall conceded at trial that the 2004 Covenant "has little bearing on this case."

**January 11, 2011**

Regions, through counsel, requested confirmation from Commonwealth that, given the express language of Endorsement No. 5, the Policy covers Freeman's denials and claims and Commonwealth would provide a defense to Regions in the Foreclosure Action. Regions also requested that Commonwealth advise it as to any other documents or information it needed with respect to Regions's claim. Duvall admitted that he "can't say" that Commonwealth has been prejudiced by any failure

of Regions to provide pre-suit information and that while Commonwealth did not originally receive a lot of payment information on the Loan, that it has now gotten "a lot of payment information."

**January 14, 2011**

Regions filed an Amended Complaint in the Foreclosure Action, again joining Freeman as a junior lienor, and alleging that any interest claimed by Freeman through the Contested Interests is inferior to Regions' mortgage lien on the Property.

**February 18, 2011**

Freeman filed an Answer, Affirmative Defenses and Counterclaim/Crossclaim in the Foreclosure Action, denying that his interest in the Property was inferior to Regions' mortgage lien, claiming to hold a superior interest in the Property, and counterclaiming for foreclosure of an equitable lien. In particular, Freeman alleged priority alternatively because: (i) Regions was aware of the Density Agreement before the closing on March 30, 2006; (ii) Regions took the PHI Mortgage subject to the Subordination Agreement signed the same day as the closing; (iii) the PHI Mortgage and Amended Mortgage were inferior to Freeman's interest in the Property because of the recording of the Memorandum on March 31, 2006; and (iv) Regions was a party to the Consent and Recognition Agreement, under which Regions had the right (but not the obligation) to cure Portofino's default thereunder. Freeman counterclaimed seeking, *inter alia*, to foreclose an equitable lien claiming the PHI Mortgage had been subordinated to the Memorandum prior to the assignment to Regions. *Id.*

**July 8, 2011**

Freeman filed an Answer, Affirmative Defenses and First Amended Counterclaim/Crossclaim, making substantially the same allegations against Regions.

**September 30, 2011**

Commonwealth filed its independent action (removed and later transferred to this Court).

**November 7, 2011**

Freeman filed an Answer, Affirmative Defenses, and Second Amended Counterclaim/Crossclaim, again denying that his interest is inferior to Regions' mortgage lien, claiming to hold a superior interest in the Property, and counterclaiming for foreclosure. In his counterclaim, Freeman alleges that he holds an interest in the Property superior to any interest held by Regions.

**April 17, 2012**

Recognizing that Freeman's pleadings, including the Second Amended Counterclaim/Crossclaim, contain allegations fairly indicating the potential for coverage, by letter dated April 17, 2012, Commonwealth notified Regions that, subject to a reservation of rights with respect to coverage and numerous conditions specified in its letter, Commonwealth had unilaterally engaged counsel to represent Regions in connection with "the defensive and affirmative assertions by Freeman's Answer and Defenses and for Counts I and V of [Freeman's Second Amended Counterclaim/Crossclaim]." Commonwealth conditioned this offer of defense upon Regions's acknowledgement of Commonwealth's right to seek clawback of amounts paid to appointed counsel in the event that the Court reformed the Policy or the actual facts showed non-coverage or applicability of an exclusion.

**April 18, 2012**

Commonwealth filed its Counterclaim for reformation and declaratory.

**June 4, 2012**

By letter dated June 4, 2012, Regions declined Commonwealth's conditional offer

of defense and explained its position in detail. In the Foreclosure Action, Freeman seeks, *inter alia,* to foreclose a lien in the amount of $8,416,000 on the Property and asserts that his lien interest is superior to the lien of Regions' mortgages.

Regions has incurred, and continues to incur, substantial attorneys' fees and expenses in connection with, *inter alia,* its defense of Freeman's denials, affirmative defenses and affirmative claims in the Foreclosure Action. Regions's claim for damages against Commonwealth derives from the denials, defenses and affirmative claims in court filings by Paul H. Freeman, as Trustee ("Freeman"), in *Regions Bank v. Prime Enterprises, LLC, et al.,* Case No. 10–CA–057197 (Fla. 20th Cir.Ct.2010) (the "Foreclosure Action"), in which Freeman denies the priority of Regions' mortgage lien and claims to hold a superior lien on the Property by virtue of: (1) an unrecorded Purchase and Sale Contract for Density Units dated December 10, 2005 originally between Freeman and Prime Homes ("Density Agreement"); (2) a recorded Memorandum of Existence of Sale and Purchase Agreement for Purchase of Density dated March 30, 2006 between Freeman and Prime Homes at Portofino Vineyards, Ltd. ("Portofino") ("Memorandum"); (3) a Subordination Agreement dated March 30, 2006 between PHI and Portofino; and (4) a Consent and Recognition Agreement dated as of March 30, 2006 among Regions, Freeman, Prime Enterprises and Portofino (collectively, the "Contested Interests").

## II. CONCLUSIONS OF LAW

### A. *Jurisdiction and Venue*

■ This Court has diversity jurisdiction under 28 U.S.C. § 1332(a)(1). Venue is appropriate in this district because (1) a substantial part of the events or omissions giving rise to the claim occurred here, and (2) Commonwealth regularly conducts business here.

### B. *Commonwealth's Reformation Claim*

■ The evidence does not support Commonwealth's reformation claim, particularly given Commonwealth's high burden of proof. Florida law recognizes a strong presumption that an insurance policy correctly expresses the parties' intent. Commonwealth must show clear and convincing evidence of a mutual mistake *and* prior agreement to which the Policy does not conform. *See Continental Casualty Co. v. City of Ocala,* 99 Fla. 851, 127 So. 894, 895–96 (1930); *Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non–Marine Ass'n,* 8 F.3d 760 (11th Cir.1993). "The clear and convincing standard requires the evidence 'be of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established.'" *Bone & Joint Treatment Ctrs. of Am. v. HealthTronics Surgical Servs., Inc.,* 114 So.3d 363, 366 (Fla. 3d DCA 2013) (quoting *Reid v. Estate of Sonder,* 63 So.3d 7, 10 (Fla. 3d DCA 2011) (citations omitted)).

■ Commonwealth must show the parties had a "meeting of the minds" on a different agreement as to coverage or exclusions than expressed in the Policy. *Golden Door Jewelry Creations,* 8 F.3d at 765–68. Evidence of the antecedent agreement and mutual mistake must be "precise, explicit, [and] lacking in confusion, about the matter in issue." *Coda Roofing, Inc. v. Gemini Ins. Co.,* No. 09–22957, 2010 WL 4689325, at *3 (S.D.Fla. Nov. 10, 2010) (King, J.) (denying reconsideration of summary judgment for insured rejecting insurer's reformation claim). The Policy and endorsements are clear and unambiguous in lacking any ex-

ception or exclusion for Freeman's claimed interest in the Property. And the evidence is crystal clear that the parties intended for Regions to hold a first-priority mortgage superior to the interest of Freeman, if any, on the Property.

Regions did not execute a single document acknowledging or agreeing to subordinate its mortgage to the Memorandum. Instead, exactly the opposite occurred. And any such agreement would have been repugnant to the terms of Regions' Executive Credit Committee approval and the loan documents signed at the March 30, 2006 closing, all of which required, and provided for, a first-priority mortgage lien in favor of Regions and a lender's policy insuring the priority of that lien.

The Court has accepted Rundquist's testimony that she did not know about the terms of the Subordination Agreement and did not agree on behalf of the bank that the Density Agreement would have any priority over the bank's mortgage. While she did agree to an opposite position in emails more than a week before the closing, she also sent other emails confirming that the Density Agreement needed to be Subordinate to the Mortgage. So, while there was conflicting evidence on this issue, the Court has made credibility findings which confirm Regions's position: the Density Agreement was to be subordinate to its mortgage. The Court finds that neither Rundquist nor anyone authorized to act on behalf of the bank agreed to subordinate the mortgage to the density agreement. Having made this factual determination, there is no need to discuss the legal issue of whether Rundquist had actual or implied authority to act on behalf of or bind the bank.

Commonwealth's pleadings and the Pretrial Stipulation indicate that the predicate for reformation is mutual mistake. During trial, counsel to Commonwealth admitted that Greenfield's issuance of Endorsement No. 5 as dictated by Goldman to Hogan did not constitute a mutual mistake, although it may constitute a unilateral mistake with inequitable conduct. *See, e.g., Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non–Marine Ass'n,* 8 F.3d 760, 765 (11th Cir.1993) (reformation requires mutual mistake or unilateral mistake and inequitable conduct and a prior antecedent agreement to which the document does not conform). Commonwealth has not moved to amend its Counterclaim to allege unilateral mistake and inequitable conduct. Even if it did and the Court permitted this, the evidence does not support reformation based on this alternative theory.

Assuming Goldman dictated Endorsement No. 5, such conduct was consistent with the loan documents, which Goldman reviewed before contacting Greenfield. All of the loan documents refer to a first-priority mortgage and a lender's policy insuring that priority. This is all Goldman saw. Goldman never discussed the loan transaction with Rundquist and was not privy to any of the emails on which Commonwealth relies in suggesting that Rundquist agreed to subordinate Regions' mortgage position to Freeman's interest in the Property or that Freeman's interest would be an exception to the Policy. There is no evidence whatever that Goldman attempted to "snooker" Greenfield or trick him into issuing Endorsement No. 5. Moreover, the Court rejects the notion that Goldman, who undoubtedly was acting in Regions's best interest, would contact Greenfield two years after the closing on the loan to request issuance of an endorsement to gut the coverage under the Policy.

Goldman denied that he had anything to do with the drafting or issuance of Endorsement No. 5. But, the Court need not resolve the conflict in testimony between

Goldman, on the one hand, and Greenfield and Hogan, on the other. Assuming Goldman was not involved, and the idea to issue Endorsement No. 5 was Greenfield's alone, this would constitute at most a unilateral mistake, not a mutual one, and there is no evidence to suggest that Regions did anything to induce Greenfield to issue Endorsement No. 5 in the manner he did. However, in light of Greenfield's understanding that Regions was to have a first-priority mortgage lien superior to the interests, if any, of Freeman in the Property, Endorsement No. 5 was entirely consistent with the antecedent agreement between the parties, and the Court finds that no mistake occurred in its issuance.

### C. Regions Claims for Defense and Coverage

#### 1. Commonwealth owes duty to defend to Regions.

■ Under Florida law, which the parties agree controls the substantive issues, Commonwealth's duty to defend depends solely on the facts and legal theories in Freeman's filings against Regions. *Westport Ins. Corp. v. VN Hotel Grp., LLC*, 513 Fed.Appx. 927, 931 (11th Cir.2013) (citing *Higgins v. State Farm Fire & Cas. Co.*, 894 So.2d 5, 9–10 (Fla.2004)); *Nat'l Union Fire Ins. Co. v. Lenox Liquors, Inc.*, 358 So.2d 533, 536 (Fla.1977); *First Specialty Ins. Corp. v. Milton Constr. Co.*, No. 12–20116, 2012 WL 2912713, at *3 (S.D.Fla. July 16, 2012) (Scola, J.). Florida refers to this as the eight corners rule—solely comparing the third party's filings against the Policy and endorsements. *See Milton Const.*, 2012 WL 2912713, at *3.

■ Commonwealth must defend Regions if Freeman's allegations "fairly and potentially" bring any portion of the suit within policy coverage, even if the actual facts show non-coverage or the legal theories are unsound. *Westport Ins. Corp.*, 513 Fed.Appx. at 931; *Lime Tree Vill.*

*Cmty. Club Ass'n, Inc. v. State Farm Gen. Ins. Co.*, 980 F.2d 1402, 1405 (11th Cir. 1993) (citing *Trizec Props., Inc. v. Biltmore Constr. Co.*, 767 F.2d 810, 811–12 (11th Cir.1985)); *Category 5 Mgmt. Grp., LLC v. Companion Prop. & Cas. Ins. Co.*, 76 So.3d 20, 23 (Fla. 1st DCA 2011) (citing *State Farm Fire & Cas. Co. v. Higgins*, 788 So.2d 992, 995–96 (Fla. 4th DCA 2001)). Any doubts are resolved in favor of Regions, as the insured. *Westport Ins. Corp.*, 513 Fed.Appx. at 930–31; *First Specialty Ins. Corp. v. 633 Partners, Ltd.*, 300 Fed.Appx. 777, 785–87 (11th Cir.2008).

■ If Freeman's allegations are partially within and outside coverage or partially within an exclusion, Commonwealth must defend Regions against all of Freeman's claims and defenses, even those not within the scope of coverage. *Westport Ins. Corp.*, 513 Fed.Appx. at 931 (duty to defend is distinct from and broader than duty to indemnify; "This duty [to defend] extends to all claims, even those not within the scope of coverage.") (citing *Baron Oil Co. v. Nationwide Mut. Fire Ins. Co.*, 470 So.2d 810, 813–14 (Fla. 1st DCA 1985)); *Lime Tree*, 980 F.2d at 1405 (same); *First Specialty*, 300 Fed.Appx. at 782–86 (reversing summary judgment against insured on duty to defend; district court erred by reviewing actual facts rather than solely pled facts in determining duty to defend; third party's pleading alleged facts partially within coverage and exclusion thereby triggering duty to defend entire action); *Hale v. State Farm Fla. Ins. Co.*, 51 So.3d 1169 (Fla. 4th DCA 2010) (where pleadings alleged insured acted intentionally (excluded) or negligently (covered), insurer must defend entire action); *IDC Const., LLC. v. Admiral Ins. Co.*, 339 F.Supp.2d 1342, 1350–51 (S.D.Fla.2004) (Moore, J.) ("Because [carrier] relies on the Exclusion to deny coverage to [insured], [carrier] has the bur-

den of demonstrating that the allegations in the Underlying Complaint are cast solely and entirely within the Exclusion, and are subject to no other reasonable interpretation.").

■ Once Commonwealth's duty to defend attaches based on Freeman's first filing indicating the possibility of coverage, the duty to defend continues unless and until Freeman files an amended pleading completely eliminating the possibility of coverage. *See Baron Oil Co. v. Nationwide Mut. Fire Ins. Co.*, 470 So.2d 810, 813–14 (Fla. 1st DCA 1985) (where initial pleading alleged facts indicating possibility of coverage, thus triggering duty to defend, but amended pleading completely eliminated possibility of coverage, duty to defend attached at time of first pleading and continued until filing of amended pleading; insurer was liable for insured's defense costs from date of initial pleading triggering coverage to date of latest pleading eliminating coverage). In *Baron Oil*, the complaint triggered coverage but an amended complaint contained allegations solely within a policy exclusion. The trial court thus concluded that no duty to defend existed for any part of the action. The appellate court reversed, holding that, because the earlier pleading had triggered the duty to defend, the carrier was liable for the insured's defense costs between the date of the original complaint and date of the last amended pleading, remanding "for determination of [the insured's] damages attributable to [the carrier's] refusal to defend the case from the filing of the original complaint to the filing of amended complaint." *Id.* at 816.[1]

In its order denying the cross-motions for summary judgment, the Court cited *Baron* and noted that following the determination of the reformation claim, the Court would review Freeman's operative pleading to evaluate the duty to defend. (*See* Order 5–6, ECF No. 289.) This does not mean that Freeman's earlier pleadings are irrelevant to the duty to defend. To the contrary, the Court must review all of Freeman's pleadings to determine whether the duty to defend was ever triggered, and if so, must review Freeman's amended pleadings, including the operative Second Amended Counterclaim/Crossclaim, to determine whether that pleading has eliminated all potential for coverage.[2]

■ Where a carrier wrongfully refuses to defend its insured, or offers a defense with a reservation of rights, it transfers to the insured the power to defend itself and forfeits any right to control the defense, including the appointment of counsel for the insured. *See BellSouth Telecomms., Inc. v. Church & Tower of Fla., Inc.*, 930 So.2d 668, 670–71 (Fla. 3d DCA 2006). In *BellSouth*, the insurer initially declined to defend its insured, which retained its own counsel and expended significant time and costs in defending the underlying case. Right before a hearing on the insured's motion for summary judg-

---

1. The Court notes that adopting Commonwealth's argument that the Court should ignore the earlier Freeman pleadings for purposes of the duty to defend would result in a potential windfall to an insurer. An insurer could refuse to defend where a duty properly existed in hopes that a subsequent amended pleading would terminate its duty, thus getting the insurer off the hook for all liability throughout the duration of the lawsuit. *Baron* plainly rejects this approach.

2. Given the Court's conclusion that the Second Amended Counterclaim/Crossclaim pleads sufficient facts to trigger the potential for coverage, the Court concludes that the duty to defend arose from the first Freeman filing and has never been eliminated by subsequent amended pleading.

ment, the insurer offered a belated defense and unilaterally retained counsel for the insured. The Third District held the insured was entitled to reject the belated defense offer, reasoning that the insurer, having initially "wrongfully refused to defend instead of defending with a reservation of rights ... forced [the insured] to assume its own defense ... for over a year." *Id.* at 672; *see also Cont'l Cas. Co. v. City of Jacksonville*, 283 Fed.Appx. 686, 689–90 (11th Cir.2008) (citing *BellSouth* and noting that where carrier wrongfully refuses to defend, it forfeits right to control defense and must reimburse insured for its counsel fees).

▬ Freeman's motion to dismiss, and his original and first amended pleadings, which allege that Freeman's claimed interest is prior to Regions' mortgage lien, fairly indicate the potential for coverage. Accordingly, Commonwealth owed a duty to defend Regions from the inception of Freeman's appearance in the Foreclosure Action.[3]

▬ The Second Amended Counterclaim/Crossclaim pleads alternatively that Regions had notice of Freeman's claimed interest before giving value, by virtue of its knowledge of the Density Agreement, or Regions agreed to subordinate its mortgage lien to Freeman's interest in the Property. Knowledge of the Density Agreement does not trigger an exclusion and is fairly and potentially within coverage. Even if the alternative allegation that Regions agreed to subordinate suggests applicability of an exclusion,[4] where allegations are partially within coverage and partially within an exclusion, the carrier must defend the entire action. *See, e.g.,*

*Westport Ins. Corp.*, 513 Fed.Appx. at 931; *IDC Const., LLC*, 339 F.Supp.2d at 1350–51. Thus, the Second Amended Counterclaim/Crossclaim does not negate Commonwealth's duty to defend, which is ongoing. *See Crawford v. Safeco Title Ins. Co.*, 585 So.2d 952, 954 (Fla. 1st DCA 1991) (title insurer owed duty to defend insured against claims covered by policy; "The assertion of this counterclaim brought the quiet title action within the policy language requiring appellees to provide for the defense of appellants 'in all litigation consisting of actions or proceedings commenced against [appellants].' ").

### 2. Commonwealth owes duty to indemnify Regions.

▬ The Court enforces an insurance policy in accordance with its plain language. *Westport Ins. Corp.*, 513 Fed. Appx. at 930–31; *ABCO Premium Fin. LLC v. Am. Intern. Grp., Inc.*, No. 11–23020, 2012 WL 3278628, at *3 (S.D.Fla. Aug. 9, 2012) (Scola, J.). An endorsement controls over general exclusionary language. *Steuart Petrol. Co., Inc. v. Certain Underwriters at Lloyd's London*, 696 So.2d 376, 379 (Fla. 1st DCA 1997), *rev. dismissed*, 701 So.2d 867 (Fla.1997). It is black-letter Florida law that "an insurer, as the writer of an insurance policy, is bound by the language of the policy." *Coda Roofing, Inc. v. Gemini Ins. Co.*, 2010 WL 3745904, at *5 (S.D.Fla. Sept. 21, 2010).

▬ Unlike the duty to defend, the duty to indemnify is determined by examining whether the actual facts show coverage. *See Harco Nat. Ins. Co. v. Zurich Am. Ins. Co.*, 479 Fed.Appx. 920 (11th

---

**3.** Indeed, Commonwealth does not argue to the contrary.

**4.** The only applicable exclusion would be Exclusion 3(a), but Endorsement Nos. 2 and 5

specifically insure Regions against the effect of the Subordination Agreement as alleged by Freeman. As discussed below, endorsements trump general exclusions.

Cir.2012) ("[T]he duty to indemnify is determined by analyzing the facts of the case[.]") (citing *State Farm Fire & Cas. Co. v. CTC Dev. Corp.*, 720 So.2d 1072, 1077 n. 3 (Fla.1998)).

■ Commonwealth issued the Title Commitment to Regions without exception or exclusion for any claimed interest of Freeman in the Property. A title commitment obligates the carrier to issue a policy consistent with the commitment. *Chi. Title Ins. Co. v. Commonwealth Forest Invs., Inc.*, 494 F.Supp.2d 1332, 1335 (M.D.Fla. 2007); *Matter of Garfinkle*, 672 F.2d 1340, 1345 n. 4 (11th Cir.1982) ("The commitment is not the actual policy. It shows what must be done prior to issuance of the policy and what the actual policy will look like once issued.").

■ The Court rejects Commonwealth's argument that the Title Commitment was invalidated by the intervention of the internal closing by Portofino and PHI or otherwise. First, the record shows that (a) Rundquist requested a title commitment, (b) Greenfield issued the Title Commitment, and (c) Greenfield never advised Rundquist that the Title Commitment was no longer valid. Furthermore, Commonwealth repeatedly referenced the Title Commitment throughout this case, including in its proposed "Revised Endorsement No. 5" attached to the Greenfield Affidavit attached as an exhibit to the Counterclaim, and in sworn answers to interrogatories.

Second, Rundquist unequivocally testified that she relied on the Title Commitment at the March 30, 2006 closing, and she always gets a title commitment before closing a real estate loan.

■ Third, Commonwealth's argument that the Title Commitment is invalid because it lacks a jacket is also unpersuasive because there is no evidence that the Title Commitment was issued without a jacket. Even Duvall admitted he had no way of knowing whether the Title Commitment had been issued with or without a jacket. Greenfield confirmed he issued the Title Commitment, and never testified that he did so without the jacket. The Court will not assume that a jacket was never issued. The Court does not believe that an insured should bear the burden of proving the attachment of a pre-signed form document to a title commitment.

■ Moreover, even if Greenfield had issued the Title Commitment without a jacket, this does not invalidate the Title Commitment because the insurer may not take advantage of the failure of a condition precedent caused by its own agent. *See U.S. Bank Nat. Ass'n v. Lawyers Title Ins. Corp.*, No. 095013702, 2013 WL 3958304, at *6 n. 5 (Conn.Super.Ct. July 11, 2013) (rejecting insurer's argument that title commitment was void because title agent issued commitment without jacket; "[the issuing agent's] failure to attach the insuring provisions, the "jacket," is chargeable to Lawyers Title and should not, alone, defeat U.S. Bank's reliance on the title commitment as a basis for liability on counts one and three."); *Mortg. Network, Inc. v. Ameribanc Mortg. Lending, LLC,* 177 Ohio App.3d 733, 895 N.E.2d 917, 923 (Ohio Ct.App.2008) (court rejected title insurer's argument that title commitment was invalid because of missing "jacket" where insurer's title agent had failed to attach it; title insurance company "cannot disaffirm liability on the policy because its apparent agent caused a condition precedent to fail.").

Finally, on August 9, 2006, Commonwealth referenced the Title Commitment's Order Number when it authorized Greenfield to issue the Policy. As Greenfield admitted, the end result of the transaction was identical to the transaction contem-

plated by the Title Commitment: Regions is the insured under a lender's title policy insuring a mortgage from Portofino on the Property securing a $36.3 million loan.

Following the March 30, 2006 closing, and in exchange for a $64,170.39 premium, Greenfield issued the Policy in August 2006 consistent with the Title Commitment and without exception or exclusion (or any mention of) the Contested Interests, notwithstanding that Greenfield had recorded the Contested Interests approximately four months earlier. Florida law requires Commonwealth to insure against adverse matters or title defects recorded during the period between the effective date of the Title Commitment, January 27, 2006, and the effective date of the Policy, April 28, 2006, because Commonwealth's agent disbursed closing funds. *See* Fla. Sta. § 627.7841 (2012).

### 3. *Exclusion 3(a) is inapplicable to Regions's claim.*

 Commonwealth bears the burden of proving exceptions and exclusions to coverage, all of which are construed against Commonwealth and in favor of coverage. *Am. Empire Surplus Lines Ins. Co. v. Chabad House of N. Dade, Inc.,* 771 F.Supp.2d 1336, 1342 (S.D.Fla.2011) (Lenard, J.). Indeed, "exclusionary insurance provisions are 'construed even more strictly against the insurer than coverage clauses.'" *Westport Ins. Corp.,* 513 Fed.Appx. at 932 (quoting *Auto–Owners Ins. Co. v. Anderson,* 756 So.2d 29, 34 (Fla.2000)).

Commonwealth claims that standard Exclusion 3(a) applies because, under the Subordination Agreement, Regions agreed to take a subordinate position to Freeman on the Property. Regions, however, was not a party to the Subordination Agreement, and the Court has found that Regions was not aware of and never agreed to the Subordination Agreement when Re-

gions received the assigned PHI Mortgage or Amended Mortgage on March 30, 2006 or at any time thereafter.

 Moreover, Commonwealth issued Endorsement No. 2, assuring Regions that, as of the extended effective date of April 28, 2006, "[t]here are no covenants, conditions or restrictions under which the lien of the mortgage referred to in Schedule A can be divested, **subordinated** or extinguished, or its validity, priority or enforceability impaired." Commonwealth thus breached its express assurance, by reason of Endorsement No. 2, that the Subordination Agreement would not affect the priority of Regions' insured mortgages.

 Endorsement No. 5 similarly and expressly insures Regions against the effect of the Contested Interests. The Court does not find that there is clear and convincing evidence that Endorsement No. 5 resulted from any mistake, much less any mutual mistake. The loan documents, approved by Greenfield, indicate that Regions was to receive a first-priority mortgage lien and a lender's policy insuring that lien priority. Abbo represented to Regions under oath as of the closing that he had not signed, and would not sign, any instrument affecting the priority of the first-priority mortgage to be delivered to Regions. (*See* Owner's Aff. (Trial Ex. P–13).) Had Greenfield intended that the mortgages delivered to Regions would be subordinate to Freeman's interest in the Property, Greenfield should have insisted on appropriate language in the loan documents declaring Regions' lien position to be second-priority to Freeman's interest; and Greenfield should never have permitted Abbo to deliver the Owner's Affidavit attesting that Regions was receiving a first-priority mortgage and Abbo had not and would not sign any document affecting that priority. (*See* Owner's Aff. at ¶¶ 3, 18 (Trial Ex. P–13).)

 All of the documents signed by Regions, and all of the documents delivered to Regions, reflect a common theme: Regions has a first-priority mortgage lien, consistent with its Loan approval, the Lender's Commitment, the Title Commitment, the Policy and the endorsements. Even well after the fact, Greenfield again confirmed Regions's understanding that it held a first lien position to which Freeman was junior, by approving Regions's draft foreclosure complaint joining Freeman as a junior lienor.

 Even absent Endorsement Nos. 2 and 5, Exclusion 3(a) is inapplicable. Regions did not create or participate in creating the Density Agreement or in the signing and recording of the Memorandum or Subordination Agreement. Regions could not have prevented Greenfield from recording these instruments because Regions did not control Greenfield. Thus, Regions could not have "created" or "suffered" any defect resulting from such instruments, as required under Exclusion 3(a). *First Am. Title Ins. Co. v. Kessler*, 452 So.2d 35, 39 n. 5 (Fla. 3d DCA 1984) ("Create" refers to "a conscious, deliberate causation or an affirmative action which actually results in the adverse claim or defect.") (quoting *Laabs v. Chi. Title Ins. Co.*, 72 Wis.2d 503, 241 N.W.2d 434, 439 (1976)). "Suffers" means "the power to prohibit or prevent [the defect] which has not been exercised although the insured has full knowledge of what is to be done with the intention that it be done." *Id.* (quoting *Ariz. Title Ins. & Trust Co. v. Smith*, 21 Ariz.App. 371, 519 P.2d 860, 863 (Ariz.1974)).

Regions also did not "assume" or "agree to" any priority of the Memorandum over its mortgages. Even if Regions knew of the executed Memorandum, and Rundquist testified that she did not recall seeing "any version of the Memorandum at any time before the March 30, 2006 closing" (Jul. 17 Trial Tr. at 280:5–20 (ECF No. 314)), Regions's mere knowledge of the Memorandum does not equal "assumed or agreed to," which requires some "deliberate act or omission" on the part of the insured to assume or agree to the defect that is superior to the insured mortgage. *Lawyers Title Ins. Corp. v. JDC (Am.) Corp.*, 818 F.Supp. 1543, 1546 (S.D.Fla.1993) (Davis, J.).

The fact that Regions knew of the Density Agreement and that a Memorandum would eventually be recorded does not mean that Regions accepted a secondary position to Freeman's claimed interest and, in fact, every loan document reflects the exact opposite, *i.e.*, that Regions intended the Loan to be secured by a first-priority mortgage lien on the Property. Regions knew that it was receiving at closing an assignment of the PHI Mortgage, which in fact created a first-priority lien on the Property, having been recorded on March 17, 2006. Regions therefore knew that its lien priority was established as of March 17, 2006. Regions also knew that it would receive an Amended Mortgage, which would retain the March 17, 2006 lien priority of the PHI Mortgage. The fact that Regions also knew that the Memorandum would be recorded subsequent to March 17, 2006 was inconsequential under Exclusion 3(a) because the subsequent recording of the Memorandum could not prime Regions's assigned mortgage priority position under the PHI Mortgage as amended by the Amended Mortgage. Indeed, Duvall admitted that from a recording perspective, the PHI Mortgage was in first position ahead of Freeman's interest in the Property, if any, by virtue of the subsequently-recorded Memorandum. *Id.* And to protect its expectation that it would receive a first-priority lien on the Property, Regions required Abbo to execute the

Owner's Affidavit attesting that as of March 30, 2006, Abbo had not and would not sign any instrument purporting to affect the priority of Regions' first mortgage position being acquired from PHI, thus negating any intent by Regions to accept a secondary position.

Moreover, "agreed to" under Exclusion 3(a) requires a contract. *See Am. Sav. & Loan Ass'n v. Lawyers Title Ins. Corp.*, 793 F.2d 780, 784 (6th Cir.1986) ("And 'agreed to' carries connotations of 'contracted.'"). The Consent and Recognition Agreement, the only agreement signed by all of the interested parties to the transaction—Freeman, Regions, Prime Enterprises and Portofino—acknowledged as of March 30, 2006 that Regions had received the PHI Mortgage by assignment from PHI (which on its face indicates it is a first mortgage). Moreover, in the Consent and Recognition Agreement, Prime Enterprises, Portofino and Freeman represent and warrant to Regions that the Density Agreement (and documents referred to therein) were the only agreements in existence involving Freeman affecting the Property. The Consent and Recognition Agreement does not mention either the Subordination Agreement or the Memorandum, and neither of those documents was then recorded. At the time of the March 30, 2006 closing, Regions had no knowledge of the executed version of the Subordination Agreement and never agreed to it. Regions had received the Owner's Affidavit and other loan documents signed by Abbo acknowledging that the mortgages delivered to Regions constituted first-priority liens and Abbo had not and would not sign anything to negate Regions' first-priority lien position. Greenfield even admitted that he had nothing from Regions by which the bank had agreed that Endorsement No. 5 should have excepted the Contested Interests from coverage.

■ The Court also rejects Commonwealth's contention that the Closing Statement triggers Exclusion 3(a) by including a vague reference to an undefined "memorandum, subordination" under the heading of "Miscellaneous Recording Costs." Rundquist testified, and the Court accepts her testimony, that she thought there was a subordination agreement to make sure that the Density Agreement was subordinate to the mortgages, and this may have been what the line item on the Closing Statement referred to. Her email to Greenfield on March 23, 2006, providing a form of subordination agreement, instructed Greenfield to make sure that "it", meaning the Density Agreement, remained subordinate to future advances under and modifications of the mortgages. Greenfield did not follow these instructions as he prepared the Subordination Agreement to make the mortgages subordinate to the Density Agreement. The evidence reflects that the two lawyers were talking past each other and were not on the same page with respect to the Subordination Agreement. Further, a closing statement is not a contract, and thus does not form the basis for excluding coverage under Exclusion 3(a). *See Cornelius v. Fidelity Nat. Title Co.*, No. 08–754, 2009 WL 596585, at *3 (W.D.Wash. Mar. 9, 2009) ("This Court, however, has no difficulty in ruling as a matter of law that the HUD–1 settlement statement before it is not a contract."); *Kirby v. Bank of Am., N.A.*, No. 09–182, 2012 WL 1067944, at *8 (S.D.Miss. Mar. 29, 2012) ("This Court agrees that the HUD–1 is not a contract."); *Jankanish v. First Am. Title Ins. Co.*, No. 08–1147, 2009 WL 779330, at *2 (W.D.Wash. Mar. 23, 2009); *Deutsch Tane Waterman & Wurtzel, P.C. v. Hochberg*, 25 Misc.3d 54, 890 N.Y.S.2d 755, 757 (N.Y.App.Div.2009).

Nor does the Closing Statement evidence Regions's agreement to subordinate

its mortgage lien to that of Freeman's claimed interest. *See Am. Title Ins. Co. v. E.W. Fin.*, 16 F.3d 449, 454–56 (1st Cir. 1994) (rejecting carrier's argument and holding that HUD–1 showing all proceeds going to seller rather than to pay off prior mortgage did not mean lender had created, suffered, assumed or agreed to prior mortgages under Exclusion 3(a)). Regions relied on the closing agent, Greenfield, to close the Loan and record the loan documents in accordance with their terms, all of which provided that Regions was to receive a first-priority mortgage. Commonwealth has failed to prove applicability of Exclusion 3(a). *See id.*

Exclusion 3(a) is inapplicable and Freeman's denials, claims and defenses in the Foreclosure Action constitute an "action[ ] or proceeding[ ] commenced against such insured, or defenses ... interposed against a foreclosure of the insured mortgage ... founded upon an alleged defect, lien, encumbrances, or other matter insured against by this policy." (*See* Policy, Conditions and Stipulations ¶ 3(a).)

### D. Commonwealth's Affirmative Defenses Do Not Negate Duty to Defend or Indemnification

■■■■ Commonwealth's defenses are predicated on matters outside of Freeman's pleadings, including the contention that the "Contested Interests" were supposed to be policy exceptions. Where the third party's pleadings do not contain allegations supporting an exclusion or exception, the duty to defend is not negated. *See Sims v. Sperry*, 835 P.2d 565, 570 (Colo.App.Ct.1992).

Commonwealth's first defense, waiver, requires that Regions intentionally relinquish a known right. *Raymond James Fin. Servs., Inc. v. Saldukas*, 896 So.2d 707, 711 (Fla.2005). Commonwealth has not proven this defense by a preponderance of the evidence. Regions relied on

the Title Commitment, which did not except or exclude Freeman's claimed interest from coverage. Regions's Executive Credit Committee approved the Loan, requiring a first-priority mortgage as collateral. The pre-closing Lender's Commitment repeated this requirement and required the delivery of a lender's policy insuring a first-priority lien on the Property. Regions closed the Loan on March 30, 2006, receiving numerous loan documents and sworn documents, all providing that Regions was receiving a first-priority mortgage lien on the Property and a lender's policy insuring that priority. And Greenfield, Abbo and Rundquist all testified that it was their respective intent that Regions receive a first-priority mortgage lien on the Property.

Commonwealth's contention that Regions waived coverage because it allegedly agreed that its mortgages would be subordinate to the Contested Interests is also negated by Endorsement No. 2, which insures that as of April 28, 2006, there are no such instruments, and Endorsement No. 5, which insures, as of April 28, 2006, the priority of the mortgages in relation to the Contested Interests.

■■■■ Commonwealth's second defense, estoppel, requires proof that Regions represented a material fact contrary to a later position on which Commonwealth detrimentally relied. *U.S. Life Ins. Co. in N.Y.C. v. Logus Mfg. Corp.*, 845 F.Supp.2d 1303, 1317–19 (S.D.Fla.2012) (Zloch, J.). Commonwealth has not proven this defense by a preponderance of the evidence. The Court cannot find that Rundquist and/or that Regions agreed, to: (i) change Regions's collateral position; (ii) amend the Title Commitment; or (iii) except or exclude Freeman's claimed interest from coverage. Commonwealth has further failed to show that it relied on any supposed statements. Instead, Greenfield re-

quested written confirmation from Regions (which never occurred) because he was well aware that he could not rely on tenuous and equivocal statements by Rundquist, particularly when those statements were contradicted by other emails from Rundquist as well as all of the documents Regions knew about at the time of the closing of the loan. Moreover, Commonwealth approved the Construction Loan Agreement, which expressly provided that Commonwealth was to issue the Policy to Regions insuring a first-priority mortgage lien.

 Nor does a preponderance of the evidence support Commonwealth's third defense, which claims that Regions failed to meet Policy conditions precedent by not providing "sufficient pre-suit information ... refuting the fact that Regions had agreed to have the [Density Agreement] as a permitted encumbrance on title." (ECF No. 57 at 9 ¶ 3.) This defense fails because, *inter alia*, at all times Commonwealth had access to all documents relating to the Density Agreement as they were possessed by Greenfield, Commonwealth's agent, who had negotiated and drafted the Density Agreement. *See Davies v. Owens–Ill., Inc.*, 632 So.2d 1065, 1066 (Fla. 3d DCA 1994) ("Whatever knowledge an agent acquires within the scope of his authority is imputed to his or her principal"); *Hardy v. Am. S. Life Inc. Co.*, 211 So.2d 559, 560 (Fla.1968) (noting that "relevant knowledge of an insurer's agent of material facts concerning the health of the prospective insured is imputable to the insurer") (internal citations omitted). Commonwealth has also failed to prove that it was substantially prejudiced by Regions's alleged failure to provide any documents. *See Ramos v. Nw. Mut. Ins. Co.*, 336 So.2d 71, 75 (Fla.1976) (carrier must show substantial prejudice in invoking duty to cooperate clause). In-

deed, Duvall had no knowledge about any prejudice supposedly suffered by Commonwealth as a result of Regions's alleged failure to provide pre-suit information.

 Moreover, the only provision in the Policy relied on by Commonwealth in connection with this defense is § 3(e) of the Conditions and Stipulations which is contained in § 3 entitled "DEFENSE AND PROSECUTION OF ACTIONS—NOTICE OF CLAIM TO BE GIVEN BY AN INSURED CLAIMANT," and provides at (e):

> In all cases where this policy permits or requires [Commonwealth] to prosecute or provide for the defense of any action or proceeding, [Regions] shall secure to [Commonwealth] the right to so prosecute or provide defense in such action or proceeding, and all appeals therein, and permit [Commonwealth] to use, at its option, the name of [Regions] for such purpose. Whenever requested by [Commonwealth], [Regions] shall give [Commonwealth] all reasonable aid in any such action or proceeding, in effecting settlement, securing evidence, obtaining witnesses, or prosecuting or defending such action or proceeding, and [Commonwealth] shall reimburse [Regions] for any expense so incurred.

This cooperation in litigation clause is not activated by its very terms because Commonwealth declined to defend Regions. Accordingly, there cannot be, and there is not, any evidence that Regions failed to provide Commonwealth with "all reasonable aid in any such action or proceeding, in effecting settlement, securing evidence, obtaining witnesses, or prosecuting or defending such action or proceeding,...." *See Chi. Title Ins. Co. v. Bristol Heights Assocs., LLC*, No. 074020477S, 2011 WL 4031565, at *10 (Conn.Super.Ct. Aug. 18, 2011) (interpreting substantially similar provision, carrier could not rely on

duty to cooperate in litigation clause because alleged failure to cooperate did not occur in connection with litigation assumed by the carrier).

Finally, despite numerous correspondence exchanged between Regions's then-litigation counsel, Ronald Rosengarten, Esq. ("Rosengarten"), and representatives of Commonwealth regarding Regions's claim, there is no evidence that Commonwealth ever requested any additional information from Regions, or indicated that Commonwealth had not received any information. Commonwealth never asked Rosengarten to provide additional information.

■■■ Commonwealth's fourth defense, unclean hands, requires that Regions committed an unconscionable act directly related to its claim. *Regions Bank v. Old Jupiter, LLC,* No. 10–80188, 2010 WL 5148467, at *5 (S.D.Fla. Dec. 13, 2010) (Hurley, J.). First, this defense is inapplicable because it does not apply to an action for damages. *Id.* at *6. Second, Commonwealth has failed to prove by a preponderance of the evidence that Regions committed unconscionable acts. Commonwealth merely alleges that "Regions knows or should know that Endorsement No. 5 was a product of a scrivener's error." (*See* ECF No. 57 at 9, ¶ 4.) This is insufficient to prove unclean hands. *See also Coda Roofing,* 2010 WL 3745904, at *5 n. 5 (rejecting carrier's similar defense: "For example, [carrier] claims that the price of an insurance premium issued to [insured] was so low that [insured] should have been aware of a discrepancy. Not only is such an argument irrelevant to contract interpretation, the logic of such an argument is certainly in doubt.").

■■■ Commonwealth's fifth defense, that Regions's claims fail for lack of consideration because Regions did not provide any separate consideration for Endorse-

ment No. 5, is refuted by the fact that all required premiums were paid. Florida law presumes that the premium for a policy includes all endorsements. *See Ohio Cas. Ins. Co. v. Fike,* 304 So.2d 136, 138 (Fla. 4th DCA 1974).

The Court cannot comprehend Commonwealth's sixth defense, that Regions's claims fail for lack of consideration because the Contested Interests fall within a Policy exclusion. In any event, consideration has nothing to do with whether or not a claim is excluded.

■■■ Regarding Commonwealth's seventh affirmative defense, Commonwealth has failed to prove by a preponderance of the evidence that Regions' claims are barred due to fraudulent inducement. Commonwealth must show that Regions made a false statement of material fact that it knew or should have known was false, intending Commonwealth to rely thereon, and that Commonwealth justifiably and detrimentally relied. *Novak v. Gray,* 469 Fed.Appx. 811, 815 (11th Cir. 2012). Commonwealth has not shown any false statement by Rundquist that she "knew or should have known" of the alleged falsity of any statements of material fact to Commonwealth. At trial, Rundquist testified that, at all times, the deal was for Regions to have a first-priority mortgage on the Property and all of the loan documents reflected this fact. (Jul. 17 Trial Tr. at 204:21–205:4 (The Officer Credit Memo contemplated Freeman having an interest in the Property, but not that Freeman would be prior to the mortgage; "that's not the transaction. The mortgage had to be a first lien position on the property"), 236:4–22 (Rundquist interpreted collateral requirement as mandating that Regions was to be superior to all other liens and mortgages and prepared

all of the loan documents in conformity with this interpretation) (ECF No. 314).)

Moreover, Commonwealth did not justifiably rely on any statements by Rundquist in 2006. Instead, the day before the March 30, 2006 closing, Greenfield asked for a specific representation from Regions and never got it. (Mar. 29, 2006 Email (Trial Ex. P–23).) And, on the following day, Greenfield permitted his clients to sign numerous loan documents (including several under oath) confirming that Regions was receiving a first-priority mortgage and that Abbo had not and would not sign anything to affect that priority. Following Commonwealth's authorization, Greenfield issued the Policy and Endorsement No. 4 in 2008 insuring the first priority of the Mortgages through the extended effective date of April 28, 2006. Greenfield reiterated Regions' first-priority coverage by issuing Endorsement No. 5, which expressly insured the priority of the mortgages in relation to the Contested Interests. Finally, four years after issuing the Policy, in 2010, Greenfield approved the Settlement Agreement and Regions's draft foreclosure complaint and judgment in connection with the Foreclosure Action, all of which indicated that Regions held a first-priority mortgage position superior to any interests of Freeman in the Property. And when Freeman called Greenfield after being served in the Foreclosure Action protesting that he was supposed to be first, Greenfield had "nothing memorable" to say. These are not the actions of a title agent relying on a supposed understanding to the contrary in 2006.

■ Finally, the Court rejects Commonwealth's argument that Endorsement No. 5 is an illegal insurance contract under § 627.784, and Fla. Admin. Code Rule 690–186.005(15)(b) and 16(g).[5] Section 627.784 provides that "[a] title insurance policy or guarantee of title may not be issued without regard to the possible existence of adverse matters or defects of title." Fla. Admin. Code Rule 690–186.005 provides that "[t]he extension of special affirmative coverage by indirect means is prohibited, *id.* at § 15(b), and permits "[i]nsurance against the attempted enforcement of known claims for ascertainable sums of money in reliance on security commensurate with such risk." *Id.* at § 16(g). However, as Duvall testified, this statutory provision is limited to **known risks;** "if we [Commonwealth] have a valid reason for thinking that it is not a good lien, for example, like a judgment lien that doesn't have the address of the creditor on it or other things like that, there are certainly times where we undertake those kind of liens." (Jul. 19 Trial Tr. at 135:5–15 (ECF No. 320).)

Whether a "known risk" existed is measured by Greenfield's understanding of the priority of the mortgage lien on the land as against Freeman's interest in the land, if any. The Contested Interests did not constitute a "known risk" as instruments adversely affecting the insured mortgage because, in Greenfield's mind, these documents only affected the excess density; according to Greenfield, Regions was always intended to have a first-priority mortgage lien on the Property superior to Freeman's interest on the Property, if any. (Jul. 17 Trial Tr. at 50:12–51:9, 122:2–123:2 (ECF No. 314).) Even Duvall acknowledged under the Court's questioning that if Greenfield's understanding of the Density Agreement was that Regions was to have a first-priority lien position on the Property superior to Freeman's interest, that would be consistent with Greenfield's

---

5. The Court previously denied as untimely Commonwealth's motion for leave to amend its affirmative defenses and add this contract illegality defense. (*See* ECF No. 192.)

agreeing to, and issuance of, Endorsement No. 5. (Jul. 19 Trial Tr. at 105:14–107:3 (ECF No. 320).)

 Furthermore, even if a violation of the Insurance Code existed (which the Court does not find) Florida law does not permit Commonwealth to assert its own violation defensively because the statute and rule on which it relies do not create a private cause of action or defense. *See First Specialty Ins. Corp. v. GRS Mgt. Assoc., Inc.,* No. 08–81356, 2009 WL 2169869, at *3, n. 4 (S.D.Fla. July 20, 2009) (Marra, J.) (party could not assert violation of insurance code defensively because subject regulatory statute did not provide private remedy). "In the absence of an express penalty in the statute, courts should assume that a policy provision is valid despite noncompliance with the Insurance Code. *Essex Ins. Co. v. Zota,* 607 F.Supp.2d 1340, 1352 (S.D.Fla.2009) (Cohn, J.), *aff'd,* 408 Fed.Appx. 323 (11th Cir.2011); *see also QBE Ins. Corp. v. Chalfonte Condo. Apt. Ass'n, Inc.,* 94 So.3d 541 (Fla.2012) (where insurance code did not provide private remedy, no private remedy would be implied by court). Here, the Legislature has already specified the penalties for a title insurer's violation of the insurance code: "A title insurer is subject to the penalties in § 624.418(2) [suspension of insurer's certificate of authority] and 624.4211 [levy of fine] for any violation of a lawful order or rule of the office or commission, or for any violation of this code, committed by: ... (2) An attorney [like Greenfield] when issuing and countersigning commitments or policies of title insurance on behalf of the title insurer." Fla. Stat. § 627.791(2) (2012).

### E. Scope of Defense and Indemnification

 Accordingly, Regions is entitled to (1) defense by Commonwealth in the Foreclosure Action from the date of Freeman's first filing, including all of Freeman's defenses to Regions' foreclosure claims against Freeman and all affirmative claims by Freeman against Regions, including those asserted in the Second Amended Counterclaim/Crossclaim;[6] and (2) indemnification for all losses suffered by Regions in the Foreclosure Action if Freeman's interest in the Property, if any, is adjudged to be superior to Regions's lien.

 Such losses include Regions's entitlement to recover compensatory damages against Commonwealth equal to the amount of all reasonable attorneys' fees and costs incurred by Regions in the Foreclosure Action, in an amount to be determined following the resolution of the Foreclosure Action. (*See* ECF No. 77; Pretrial Stip. § V, ¶ 1 n. 23.)

Such losses also include Regions's entitlement to recover all other compensatory damages, for all losses suffered in the Foreclosure Action (if any), in an amount to be determined following the resolution of the Foreclosure Action. (*Id.*)

 Regions is further entitled to recover its reasonable attorneys' fees and costs against Commonwealth in this action, pursuant to Florida Statute Section 627.428, upon motion submitted by Regions within the time limits and requirements of this Court.

---

**6.** Commonwealth is not entitled to appoint counsel for Regions in the Foreclosure Action on a go-forward basis. Florida law does not permit the carrier to control the defense after the carrier wrongfully refuses to defend, as the Court has found here. *See BellSouth Telecomm., Inc.,* 930 So.2d at 670–71.